## BARBARA D. CARROLL *vs.* JAMES P. KARTELL.

No. 00-P-219.

Middlesex. January 9, 2002. - September 25, 2002.

Present: LAURENCE, DREBEN, & TRAINOR, JJ.

*Abuse Prevention. Protective Order. Words, "Abuse."*

On appeals from orders issuing and later extending an abuse prevention order issued under G. L. c. 209A, this court vacated both orders, where there was no basis for concluding that the person against whom the orders had issued (defendant) had placed the complainant "in fear of imminent serious physical injury," since the complainant's subjective and unspecified fear of the defendant was insufficient to meet the definition of "abuse" under G. L. c. 209A, § 1(*b*). [85-87]

CIVIL ACTION commenced in the Concord Division of the District Court Department on April 15, 1999.

An abuse prevention order was issued by *Paul L. McGill*, J., and the order was extended by *William E. Melahn*, J.

*J.W. Carney, Jr.*, for the defendant.

TRAINOR, J. James P. Kartell appeals from two abuse prevention orders[1] issued against him pursuant to G. L. c. 209A upon the complaint of Barbara D. Carroll. Finding insufficient evidence supporting the orders, we vacate both.

*Facts.* Kartell and Carroll met at an event at the Boston Museum of Science in early April of 1999. They had what Carroll later described as a "nice conversation," and soon thereafter met for coffee with another couple at the Burlington Mall. At

---

[1]The first, issued ex parte on April 15, 1999, was for one week. After a full hearing, that order was extended on April 22, 1999, to one year.

some point prior to their next meeting, Carroll disclosed to Kartell that she was divorcing an abusive husband.[2]

Two days later, on Easter Sunday, the two met for a movie and dinner date. In her complaint, Carroll stated that Kartell was insistent that she ride with him from the movie theater to the restaurant in his car. She declined and drove her own car. Carroll further stated that, during dinner, Kartell described a restraining order obtained by his wife as "a feminist tool to screw him over," and asserted several times that he would "never hurt [Carroll]" or "do harm to [her] children."

According to Carroll, Kartell began telephoning her house with great frequency.[3] In some instances he spoke to Carroll's children, asking them about her schedule and how to contact her, and in other instances he spoke to Carroll directly. During one of these telephone conversations, Carroll told Kartell that she was concerned about a ticket he had reserved in her name for an event; that he was very abrupt and frightened her; and that he should not contact her further.[4] Carroll further alleged that Kartell sent mail to her house, and attempted to send her facsimiles.[5]

Carroll last encountered Kartell at a Museum of Science brunch. This final meeting was approximately eleven days after their first meeting and seven days after their Easter Sunday movie and dinner date. On her way to this event, Carroll learned from a friend that Kartell had recently been charged with murder in connection with the shooting death of his wife's boyfriend.[6] During the brunch, Kartell approached Carroll several times at-

---

[2]We learn later that Carroll had a restraining order in effect against her husband. It is not clear whether Kartell was aware of this fact prior to their next date on Easter Sunday.

[3]It is unclear from the record when these phone calls began, or when the frequency increased to the level alleged by Carroll.

[4]It is unclear from the record exactly when these remarks were made and whether they occurred in the same or different telephone conversations.

[5]The record contains one letter from Kartell to Carroll, sent after their final meeting. There is no other evidence of letters or facsimiles.

[6]Although the case had received considerable media attention, Carroll was not aware of these events or Kartell's involvement until told by her friend. Kartell had discussed a fight that resulted in his broken collar bone, but had not told Carroll that a homicide had occurred or that he had been charged with murder.

tempting to speak with her. Describing Kartell's attempts as "insistent," Carroll stated that after she told him not to contact her he "demanded to call [her] that evening." Apparently, Kartell did not telephone Carroll again. Two days later, Carroll received a letter from Kartell containing reassurances that Kartell meant no harm to her or her family. Kartell also stated that rather than telephone, "which you might regard as intrusive," he would hope that the two could "continue to cultivate a friendship," but only if she were to contact him.

On April 15, 1999, two days after receiving Kartell's letter, Carroll filed a complaint in District Court for a protective order against Kartell pursuant to G. L. c. 209A. After an ex parte hearing, an order of one week's duration issued prohibiting Kartell from contacting Carroll or her children. On April 22, 1999, both parties appeared in District Court for a hearing, after which the judge extended the order for one year. Kartell filed a timely appeal.

*G. L. c. 209A.* Under § 3 of G. L. c. 209A, as amended through St. 1998, c. 179, § 5, a person "suffering from abuse" by a "family or household member"[7] may seek protection from such abuse by application to the court for an order requiring the defendant (among other measures) to refrain from abusing or contacting the victim. "Abuse" is defined by the statute as acts "(*a*) attempting to cause or causing physical harm; (*b*) placing another in fear of imminent serious physical harm; [or] (*c*) causing another to engage involuntarily in sexual relations by force, threat or duress." G. L. c. 209A, § 1, as amended through St. 1996, c. 450, § 232. See *Commonwealth* v. *Gordon*, 407 Mass. 340, 344-345 (1990); *Wooldridge* v. *Hickey*, 45 Mass. App. Ct. 637, 638-639 (1998).

Kartell argues on appeal that there was no basis for the judge

---

[7]As defined in G. L. c. 209A, § 1, as amended through St. 1996, c. 450, § 232, "family or household members" include persons who "are or have been in a substantive dating or engagement relationship" as adjudged by the court in consideration of the following factors: "(1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship." We assume without deciding that the relationship between the parties in this case fell within the statutory definition.

to conclude that he had placed Carroll "in fear of imminent serious physical harm."[8] We agree. Kartell's actions, while persistent, did not rise to the level of "abuse" as so defined. This definition ("placing another in fear of imminent serious physical injury") closely approximates the common-law description of the crime of assault, and we are guided by the law of that crime. *Commonwealth* v. *Gordon*, 407 Mass. at 349. *Commonwealth* v. *Robicheau*, 421 Mass. 176, 181 (1995). Accordingly, we consider whether "the actions and words of the defendant placed [Carroll] in reasonable apprehension that physical force might be used against her." *Ibid.*

There is no evidence that Kartell ever threatened Carroll, either implicitly or explicitly, with physical harm. Instead, there is evidence that certain aspects of Kartell's behavior (e.g., his persistent phone calls and other unsolicited efforts to contact her), combined with the revelation of the criminal charges against him, caused Carroll to fear Kartell and his attentions generally. However, Carroll's subjective and unspecified fear of Kartell is insufficient to meet the definition of "abuse" under G. L. c. 209A, § 1(*b*), and thus fails to serve as the basis for issuance of a c. 209A order. "Generalized apprehension, nervousness, feeling aggravated or hassled, i.e., psychological distress from vexing but nonphysical intercourse, when there is no threat of imminent serious physical harm, does not rise to the level of fear of imminent serious physical harm." *Wooldridge* v. *Hickey*, 45 Mass. App. Ct. at 639. See *Larkin* v. *Ayer Div. of the Dist. Court Dept.*, 425 Mass. 1020 (1997).

Although Carroll stated repeatedly during the hearings that she was frightened by Kartell's behavior, she identified no particular menacing language or gesture suggesting she was in imminent peril of physical force being used against her.[9] It is possible that Carroll's experience with domestic violence caused

---

[8]The G. L. c. 209A order was apparently sought and obtained on this basis alone; Carroll made no allegation in her complaint that Kartell caused or attempted to cause physical harm, or that he caused her to engage involuntarily in sexual relations.

[9]Carroll did voice particular concern regarding Kartell's statements that he would "never hurt [her]" or "do harm to [her] children," asserting these statements were made "out of the blue" and suggesting that they represented a threat of some kind. However, given that soon after meeting Kartell Carroll

her to be particularly sensitive to Kartell's assertiveness and his persistent efforts to contact her. Seen in this light, her fear of Kartell is understandable. The standard for determining whether a defendant's acts rise to the level of abuse, however, is not subjective. Rather, the court looks to whether the plaintiff's apprehension that force may be used is reasonable. See *Commonwealth* v. *Robicheau*, 421 Mass. at 181-182. See also *Commonwealth* v. *Gordon*, 407 Mass. at 349 (in determining whether apprehension of anticipated physical force is reasonable, court examines "the actions and words of the defendant in light of the attendant circumstances"). Objectively considered, Carroll's apprehension here was not reasonable. Contrast *Commonwealth* v. *Gordon, supra* at 349-350 (defendant appeared at victim's house in violation of c. 209A order, called victim "bitch" and "whore," and prevented victim from closing door to her house by propping his back against it); *Commonwealth* v. *Robicheau, supra* (defendant parked and stood in street in front of victim's house in violation of c. 209A order, yelled obscenities and made obscene gesture, and later told her over telephone that he would kill her).

Carroll unquestionably perceived Kartell's behavior as threatening, and the judge undoubtedly acted out of an abundance of caution. Nevertheless, the powers of the court under c. 209A must be exercised in accordance with the statutory language, which appropriately sets a higher bar for the issuance of a protective order than is found in the facts of this case. "The judge must focus on whether serious physical harm is imminent and should not issue a c. 209A order on the theory that it will do no harm, i.e., 'seems to be a good idea or because it will not cause the defendant any real inconvenience.' " *Wooldridge* v. *Hickey*, 45 Mass. App. Ct. at 639, quoting from *Smith* v. *Joyce*, 421 Mass. 520, 523 n.1 (1995).

The orders issued April 15, 1999, and April 22, 1999, are vacated. The District Court judge shall cause a notification and direction to be sent, conformably with G. L. c. 209A, § 7, third

---

disclosed to him her experience with domestic violence, his statements may have been intended as a reassurance to her that she had nothing to fear from him.

paragraph, for the destruction of all records of the vacated orders.

*So ordered.*