BRITTANY SZYMKOWSKI[1] *vs.* PATRICK SZYMKOWSKI.

No. 01-P-118.

Essex. October 8, 2002. - February 5, 2003.

Present: KANTROWITZ, KASS, & MILLS, JJ.

*Abuse Prevention. Child Abuse. Protective Order.*

In an action for a protective order under G. L. c. 209A, the conduct of the defendant father in telling his seven year old daughter about peculiar and frightening dreams; tossing a milk container at the child; cuffing her under the chin in irritation; giving her a kick in the back of the legs while both were in bed, again in irritation; and pinching his daughter on the arm so that it left a mark did not constitute abuse with the meaning of the statute. [286-289]

COMPLAINT for protection from abuse filed in the Essex Division of the Probate and Family Court Department on February 28, 2000.

The case was heard by *Edward J. Rockett,* J.

*Patrick Szymkowski,* pro se.

KASS, J. Violence among family or household members is the social ill for which G. L. c. 209A attempts a remedy.[2] *Turner* v. *Lewis,* 434 Mass. 331, 334 (2001). We decide that the conduct described by the Probate Court judge as the basis of a c. 209A order against the defendant did not, within the meaning of the

---

[1]By her mother and next friend, Christine King-Leland.

[2]Section 1 of G. L. c. 209A defines "family or household members" as persons who: "(a) are or were married to one another; (b) are or were residing together in the same household; (c) are or were related by blood or marriage; (d) hav[e] a child in common regardless of whether they have ever married or lived together; or (e) are or have been in a substantive dating or engagement relationship, which shall be adjudged by district, probate or Boston municipal courts [upon] consideration of the following factors: (1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship."

statute, involve the infliction of physical harm on his daughter — she was seven years old at the time of the c. 209A hearing — nor did the defendant place her in fear of imminent serious physical harm.[3]

*Facts.* We take the facts largely from those found by the Probate Court judge. Chapter 209A proceedings are civil in nature, *Jones* v. *Gallagher,* 54 Mass. App. Ct. 883, 886 (2002), and we accord the judge's findings the great deference prescribed by Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). We may supplement those findings with inspection of the transcript of the c. 209A proceedings to assist us in determining whether the evidence, as matter of law, warranted issuance of the c. 209A order. See *Larkin* v. *Ayer Div. of the Dist. Court Dept.,* 425 Mass. 1020, 1020 (1997).[4]

Patrick Szymkowski, the defendant, and his wife, Christine, were divorced January 9, 1998. Christine remarried and is now known as Christine King-Leland. The divorce judgment provided for shared legal custody of three minor children, primary custody to be with the mother. The defendant had regular visitation with the child, Brittany. Relations between the defendant and King-Leland since their separation have been hostile and distant.

The precursor to the filing of the abuse complaint by King-Leland, on behalf of Brittany, against the defendant was a five-day Vermont skiing trip in February, 2000, that the defendant had taken with Brittany. Brittany complained of four events during that trip. *First.* On a Saturday morning, while in bed at a motel where she and her father had shared the available bed, Brittany said that she missed her mother. That annoyed the defendant and he kicked Brittany "hard" in the back of her legs. *Second.* Brittany woke up in the middle of the night

---

[3]Conformably with G. L. c. 209A, § 3, the abuse prevention order was for a period of time that did not exceed one year. It may well be that the Probate Court issued one or more extensions of the prevention order. The last order that appeared in the record appendix, however, had an expiration date of March 19, 2001. If the c. 209A order had expired, the appeal from it would not be moot. See *Frizado* v. *Frizado,* 420 Mass. 592, 593-594 & n.2 (1995); *Wooldridge* v. *Hickey,* 45 Mass. App. Ct. 637, 638 (1998).

[4]The evidence was conflicting. We read it in the light most favorable to the plaintiff. See *Ford* v. *Grafton,* 44 Mass. App. Ct. 715, 721, cert. denied, 525 U.S. 1040 (1998).

and asked for a glass of milk. The defendant said, "Wait, I'm finishing a dream . . . ." In the dream, as he then related it to Brittany, she was on the floor playing; dust bunnies and monsters came out from under the bed and cut her with a knife until she died. He, the father, then took the dust bunnies and monsters outside, poured gunpowder on them, and killed them. *Third.* On a Wednesday morning, the fifth day of the ski trip, Brittany said she did not feel well and did not want to go to ski school, in which her father had enrolled her. The defendant told her that "quitters never win, and winners never quit." Brittany reported that the defendant, by way of emphasis, threw an empty plastic milk container at her that hit her foot. *Fourth.* On the way back from the Killington, Vermont, ski area, the defendant stopped with Brittany at a K-Mart store in New Hampshire to buy a piece of jewelry for her. The two became separated when he walked to a cashier to conclude his purchase. She was looking at "pretty pink Easter eggs." The defendant asked a customer service representative to page his daughter but spotted her before a page went out. Loud enough for Brittany to hear, and for her benefit, the defendant said to the customer representative, "Don't call the police." He then took Brittany aside and struck her twice with his hand under her chin.

In addition to the ski trip incidents, the Probate Court judge found that the father had pinched Brittany's arm "on one occasion in the past, and that this incident caused her physical harm that resulted in bruises." In his findings, the probate judge also noted with disapproval that the defendant frequently had shared a bed with Brittany in motel or hotel rooms when traveling with her. The judge further found that there had been an occasion when the defendant had angrily pushed Brittany into the back seat of a car "and press[ed] and pin[ned] her down."

*Discussion.* Administration of the potent remedies of G. L. c. 209A requires great sensitivity for the suffering and, sometimes, the mortal danger that flow from domestic violence. See *Commonwealth* v. *Contach,* 47 Mass. App. Ct. 247, 253 (1999); *Jones* v. *Gallagher,* 54 Mass. App. Ct. at 887-889. With good reason, c. 209A has teeth, including: bail review consequences (see G. L. c. 276, § 57, as amended by St. 1992, c. 201,

§ 2); entry on a State record of abusers (St. 1992, c. 188, § 7);[5] criminal record for violation of a c. 209A order; and deportation (see *Commonwealth* v. *Villalobos*, 437 Mass. 797, 798 [2002]).

For those reasons, among others, a court "should not issue a G. L. c. 209A order simply because it seems to be a good idea or because [it seems] it will not cause the defendant any real inconvenience." *Smith* v. *Joyce*, 421 Mass. 520, 523 n.1 (1995). A c. 209A order will infallibly cause inconvenience. In considering whether to issue a c. 209A order, the judge must focus on whether serious physical harm is imminent. *Ibid. Wooldridge* v. *Hickey*, 45 Mass. App. Ct. at 639. *Carroll* v. *Kartell*, 56 Mass. App. Ct. 83, 87 (2002). Generalized apprehension does not rise to the level of fear of imminent serious physical harm. *Id.* at 86-87. In considering an application for a c. 209A order, a judge must be alert against allowing the process to be used, as it sometimes is, "abusively by litigants for purposes of discovery and harassment." *Jones* v. *Gallagher*, 54 Mass. App. Ct. at 887 n.4.

In the instant case, there are distinct overtones of the use of c. 209A as a weapon in circumstances of reciprocal hostility between divorced parents and differences, as well as genuine concern, about how to deal with a child. We have, in recapitulation of the judge's findings, a father who told his seven year old about peculiar and frightening dreams; tossed a milk container at the child; cuffed her under the chin in irritation; gave her a kick in the back of her legs while both were in bed, again because he was irritated; and pinched his daughter on the arm so that it left a mark.[6]

On the basis of the findings that the judge made, the defendant is hardly entitled to an "A" grade as a parent. Indeed, his conduct is unacceptable parental behavior, but c. 209A is not

---

[5]*Vaccaro* v. *Vaccaro*, 425 Mass. 153, 155 (1997).

[6]The evidence upon which that finding depends is testimony by King-Leland that Brittany said her father, in December, 1998, had pinched her down her arm and made a line. In a literal sense that might come within the "causing physical harm" category of "abuse" as defined in G. L. c. 209A, § 1, but as in *Cobble* v. *Commissioner of the Dept. of Social Serv.*, 430 Mass. 385, 391-392 (1999), there was an absence of affirmative evidence of "soft-tissue swelling or skin bruising," except for the child's own statements. The *Cobble* case involved a complaint of "abuse" under G. L. c. 119, § 51A.

designed as a prod toward better parenting. Rather, the statute, as we have said, aims to prevent physical harm. Cf. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 591-592 (1981) (it is not the quality of parental conduct that justifies State action but the fact of endangerment to the child). Of course, violence to children may not be tolerated, and c. 209A is part of the arsenal to prevent such violence. The facts in this case lie more on the intemperate parenting side of the line than the parental violence side of the line. Cf. *Cobble* v. *Commissioner of the Dept. of Social Serv.*, 430 Mass. 385, 391-393 (1999). In such circumstances, as we suggest below, a court concerned that a parent may be interacting with a child in hurtful ways should consider the less draconian but equally, if not more, effective measures that are available.

It misconceives the level of social pathology at which c. 209A aims, however, to categorize the defendant's conduct as abuse within the meaning of that statute. By definition, as we have discussed, abuse that warrants a protective order in the c. 209A sense implicates physical harm or anticipation of imminent serious physical harm. See *Commonwealth* v. *Gordon*, 407 Mass. 340, 349 (1990).

Much of what the judge found — that Brittany did not enjoy visits with her father and wished to avoid them, that those visits upset her, and that the father and daughter should attend counseling — points the way to the appropriate remedy, namely, a modification in the custody and visitation components of the divorce judgment, which could include supervised visitation or the cessation of visitation pending the further order of the court.

At the c. 209A proceedings, the defendant offered to place in evidence a contemporaneous report completed pursuant to G. L. c. 119, § 51B, by a social worker of the Department of Social Services (DSS), dated March 10, 2000 (the c. 209A hearing occurred on March 10, 2000, and March 17, 2000). The DSS social worker had investigated a non-mandated report of abuse filed under G. L. c. 119, § 51A, and had determined in her § 51B report that the allegations of abuse and neglect by the

defendant were unsupported.[7] The judge refused to consider the report for any purpose on the ground that it was hearsay. Although the judge was entitled to reject the ultimate evaluation of the DSS social worker, a judge, in the exercise of discretion, may consider the factual content of such reports in cases involving the care and custody of children. See *Adoption of George,* 27 Mass. App. Ct. 265, 269-275 (1989); *Custody of Michel,* 28 Mass. App. Ct. 260, 267 (1990); *Adoption of Irene,* 54 Mass. App. Ct. 613, 620 n.8 (1990). Those cases arose out of care and protection (G. L. c. 119, §§ 24-26) and termination of parental rights (G. L. c. 210, § 3) proceedings, but the considerations that favored the admission in evidence, on a discreet basis, of government reports in those contexts bear as well on c. 209A proceedings. The very nature of c. 209A proceedings "is intended to be expeditious and as comfortable as it reasonably can be for a lay person to pursue." *Frizado* v. *Frizado,* 420 Mass. at 598. "[T]he rules of evidence need not be followed, provided that there is fairness in what evidence is admitted and relied on . . . The process must be a practical one." *Id.* at 597-598.

> *Order issued under G. L.*
> *c. 209A is vacated.*

---

[7]The charges that underlay the § 51A complaint were substantially the same ones as those advanced in support of the application for a c. 209A order.