## Faye Ginsberg vs. Jonathan Blacker.

No. 05-P-874.

Middlesex. April 4, 2006. - August 17, 2006.

Present: Laurence, Dreben, & Vuono, JJ.

*Abuse Prevention. Protective Order. Practice, Civil,* Attorney's fees, Costs. *Words,* "Imminent serious physical harm," "Abuse."

The judge at an abuse prevention hearing properly concluded that a preponderance of evidence demonstrated that the defendant had placed the plaintiff "in fear of imminent serious physical harm," which constituted abuse justifying the issuance of a protective order under G. L. c. 209A, §§ 1 and 3. [142-148]

COMPLAINT for protection from abuse filed in the Middlesex Division of the Probate and Family Court Department on February 14, 2005.

The case was heard by *Judith Nelson Dilday,* J.

*Lawrence L. Blacker* for the defendant.

*Michael G. Xavier* for the plaintiff.

LAURENCE, J. The defendant, Jonathan Blacker, appeals from a March 4, 2005, abuse prevention order issued against him pursuant to G. L. c. 209A at the behest of his ex-wife, Faye Ginsberg.[1] He asserts that the Probate and Family Court judge erred because there was insufficient evidence to support a finding that the conduct complained of by his ex-wife had placed her "in fear of imminent serious physical harm" as required by the defini-

---

[1] The parties were married in 1985 and divorced in 2003. They had two children, a daughter who was a college freshman at the time of the hearing, and a thirteen year old son who was disabled and lived with his mother in the marital home, although the parties shared legal custody. The March 4, 2005, order would have expired, without further judicial action, on March 3, 2006, and the record is silent as to its present status. Blacker's appeal is not moot even if the order did expire. See *Frizado* v. *Frizado,* 420 Mass. 592, 593-594 (1995); *Szymkowski* v. *Szymkowski,* 57 Mass. App. Ct. 284, 285 n.3 (2003).

tion of "abuse" in G. L. c. 209A, § 1, inserted by St. 1978, c. 447, § 2.[2] We affirm.

*Facts.*[3] Approximately two months before the February 3, 2005, incident that prompted Ginsberg to seek a protective order (described *infra*), Blacker's attitude and conduct toward her became hostile and increasingly erratic, sometimes "out of control," and his temper periodically flared. His changed behavior was precipitated by her decision to reduce the asking price for the marital home (which either the divorce decree or the parties' separation agreement, neither of which is in the record, apparently required to be sold, with the proceeds divided between the parties). Blacker persisted in blaming Ginsberg for reducing the sale price, telling her that she had "ruined his life," that the sale of the house would be "the end of [their] family," and that "the Ginsberg family [which included his ex-wife] should be shot." He would continually call at "all hours of the day," repeatedly come into the house without notice or invitation,[4] personally deliver her support checks despite her request that he send them to her, and often drive by the house.

---

[2]The defendant purports also to be challenging the February 14, 2005, ex parte abuse prevention order that was continued for one year by the March 4 order (both orders having been entered on essentially the same evidentiary basis). Assuming that such a separate challenge may be maintained, cf. *Larkin* v. *Ayer Div. of the Dist. Ct. Dept.*, 425 Mass. 1020, 1020 (1997); *Corrado* v. *Hedrick*, 65 Mass. App. Ct. 477, 483 (2006), we need not address the issue because the defendant did not file a notice of appeal with respect to the ex parte order.

[3]Since the judge made no oral or written findings, we recite the evidence in some detail. See *Keene* v. *Gangi*, 60 Mass. App. Ct. 667, 667 n.1 (2004). The judge's questions during the hearing and her ultimate decision make it clear that she credited Ginsberg's version of the evidence and rejected Blacker's conflicting testimony, which essentially consisted of denying all of Ginsberg's charges and describing her affidavit in support of the ex parte order as entirely false (a position which the judge questioned at the hearing). We accord the credibility determinations of the judge who "heard the testimony of the parties . . . [and] observed their demeanor," *Pike* v. *Maguire*, 47 Mass. App. Ct. 929, 929 (1999), the utmost deference. See *Matsushita Elec. Corp. of America* v. *Sonus Corp.*, 362 Mass. 246, 254 (1972); *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

[4]Ginsberg testified that she allowed Blacker a key to the house so that he could have access in the event of an emergency involving their disabled son or her daughter returning from college when Ginsberg might be unavailable. After the February 3, 2005, incident, she changed the locks.

During this time, according to the son's health aide, there was frequent yelling between the parties.

This period of rising tensions between the parties[5] culminated on February 3, 2005, when Blacker again entered the house unannounced and proceeded into the kitchen where Ginsberg was preparing dinner with her son and the son's aide. Blacker suddenly became enraged when be observed what he believed to be an unflattering haircut he mistakenly assumed Ginsberg had given their son. He began yelling at her about the supposed haircut and was "totally out of control, pulling his hair, pacing back and forth, [and] very physically aggressive with [Ginsberg]." When she asked him to leave the house, "he went berserk." He "came right up into [Ginsberg's] face," screaming and waving his hands about very close to her face, his face so close to her that she "could feel his spit on [her] face." When she attempted to leave the kitchen and ran upstairs, Blacker followed her, shouting obscenities and "call[ing] [her] terrible names in front of" their son and the aide. She came back downstairs and told Blacker she would call "911" if he did not "get away from [her]." Blacker then left, saying that Ginsberg was a "stupid f'n crazy f'n bitch."

---

[5] On cross-examination, Ginsberg admitted that during the month prior to the February 3 incident there had been a few instances of nonhostile interactions between the parties. Those occasions, however, involved either their joint efforts to assist their children (Blacker's driving their daughter and Ginsberg to and from the airport, assisting with their daughter's college application process, staying at the house with the son when Ginsberg was away) or to maintain the marital home (Blacker's being requested to come to fix a malfunctioning alarm system). Those instances appeared to represent, at best, a truce in their ongoing conflict for their limited mutual self-interest, rather than any warming of relations. Blacker complains in his brief that the judge refused to allow his counsel to cross-examine Ginsberg regarding her allowing him to drive her and the children to visit her relatives on Christmas Eve but does not present a coherent argument that the judge's action was an abuse of discretion or otherwise erroneous. He also asserts that the trial judge "showed animus" toward his counsel and "may have been biased," but also makes no acceptable appellate argument on the point. Blacker's brief further mentions the fact that Ginsberg conceded that she was aware that Blacker had recently filed a complaint for modification of his alimony and support obligations, apparently to suggest that Ginsberg was using the protective order process to gain leverage in the modification proceeding, but no evidence supporting that proposition (which would go only to the issue of credibility at the hearing) appears in the record, and no reasoned argument directed to the matter appears in Blacker's brief. All of these abortive "arguments" fail to comply with Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

Ginsberg felt that Blacker had "really lost it [and was] going to snap." Although she conceded that he had never struck her before, his "violent streak" had reached the point, given his frightening and "unexplainable" outburst, that she feared "that he will strike [her] or do something much worse" and that "the violence is imminent." She applied for the c. 209A order one and one-half weeks later.[6]

Blacker's response to Ginsberg's evidence consisted of vehemently controverting every one of her allegations, denying in particular that he had ever entered the house unannounced, yelled at her, swore at her, made any threats to her or her family, or raised his hand to her "even half an inch" (indeed, he protested that he had "never raised [his] hand to a single human being in [his] life"). He described his conduct during the February 3 incident (about which he admitted he could not recall details) as "just sort of express[ing] . . . frustration" over the supposed haircut, in a normal and "friendly," though "stern," tone of voice. The judge expressly noted that, as Blacker testified about his "frustration," "he was doing [in court] exactly what [Ginsberg] said he did with his hands," as to which conduct the judge observed, "[t]hat's an assault."

*Discussion.* The issue presented is whether the judge could properly conclude that a preponderance of the evidence demonstrated that Blacker had, on February 3, 2005, placed Ginsberg "in fear of imminent serious physical harm," which constitutes "abuse" justifying the issuance of a protective order under G. L. c. 209A, §§ 1 and 3. See *Iamele* v. *Asselin*, 444 Mass. 734, 735, 739-740 (2005); *Uttaro* v. *Uttaro*, 54 Mass. App. Ct. 871, 873-874 (2002).

We note that, for c. 209A purposes, the conduct proscribed as abuse "closely approximates the common-law description of assault, see *Commonwealth* v. *Gordon*, 407 Mass. 340, 349 (1990)." *Uttaro* v. *Uttaro*, *supra* at 873. Under the common law, "it is

---

[6]The son's aide testified to witnessing both the February 3 incident over the haircut and prior yelling between the parties. Blacker advances no argument regarding the significance of Ginsberg's delay in seeking the order (a delay that can be regarded as understandable in light of the fact that she relied on Blacker's assistance with their disabled son, maintaining the house and, to a lesser extent, helping their daughter). Contrast *Keene* v. *Gangi*, 60 Mass. App. Ct. 667, 669-670 (2004).

well established in this State that an act placing another in reasonable apprehension that force *may* be used is sufficient for the offense of criminal assault" (emphasis added). *Commonwealth* v. *Delgado*, 367 Mass. 432, 437 (1975).[7] "In determining whether an apprehension of anticipated physical force is reasonable, a court will look to the actions and words of the defendant in light of the attendant circumstances." *Commonwealth* v. *Gordon*, *supra* at 349. A central feature of c. 209A "abuse" is that the victim's fear or apprehension caused by the defendant's words or conduct "must be more than 'subjective and unspecified'; viewed objectively . . . 'the plaintiff's apprehension that force may be used [must] be reasonable.' " *Vittone* v. *Clairmont*, 64 Mass. App. Ct. 479, 486 (2005), quoting from *Carroll* v. *Kartell*, 56 Mass. App. Ct. 83, 86-87 (2002).

We have no difficulty in upholding the judge's implicit findings that Blacker's conduct, by word and act, on February 3, 2005, was not only "menacing by objective standards," *Commonwealth* v. *Slaney*, 345 Mass. 135, 140 (1962), but created an apprehension of imminent serious physical harm on the part of Ginsberg that was objectively reasonable. Blacker's intimidating behavior toward his ex-wife, as testified to by Ginsberg and credited by the judge, rationally could be interpreted by the judge as "creat[ing] a picture of a volatile situation in which the possibility of physical abuse was present." *Commonwealth* v. *Gordon*, 407 Mass. at 350. Moreover, it readily could be inferred from Blacker's conduct on February 3, 2005, that Ginsberg, even if she had not expressly so testified, reasonably apprehended that force "*might* be used against her" (emphasis added), *Commonwealth* v. *Robicheau*, 421 Mass. 176, 181 (1995),

---

[7]In *Commonwealth* v. *Delgado*, 367 Mass. at 437 n.3, the court noted the similarity of the offense of criminal assault in Massachusetts law to the civil tort of assault, as set forth in the Restatement (Second) of Torts § 31 (1965), which provides that words may create liability for assault when uttered "together with other acts or circumstances . . . [that] put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." The distinction between civil and criminal assault is that in the latter case the Commonwealth need not prove that the victim was actually in fear or apprehension of harm. See *Commonwealth* v. *Slaney*, 345 Mass. 135, 138-139 (1962).

at any moment,[8] given his increasingly "erratic and unstable behavior" over the recent past that had "escalated" to the point that she felt "[h]e's going to snap."

The requisite element, that the plaintiff must reasonably apprehend "imminent serious physical harm," is satisfied by the threat Blacker communicated through his hands flailing in Ginsberg's face, so close to her that his angry shouting caused his spittle to spray upon her face. While naked hands (and other body parts) are not, as matter of Massachusetts law, dangerous weapons, it has been acknowledged that they may be used to inflict "disabling or disfiguring injuries," serious enough to

---

[8]Compare Restatement (Second) of Torts § 29 (1965), where it is said that, although liability for assault requires that the defendant "put the [victim] in apprehension of an imminent contact," *ibid.*, it is not required that the defendant be able instantly to carry out the physical violence threatened by his words and conduct: " 'Imminent' does not mean immediate, in the sense of instantaneous contact, as where the [victim] sees the actor's fist about to strike his nose. It means rather that there will be no significant delay. It is not necessary that one shall be within striking distance of the other . . . . It is enough that one is so close to striking distance that he can reach the other almost at once . . . ." *Id.* § 29 comment b.

Although our research has not disclosed such cases in Massachusetts, courts in other jurisdictions have held that shouting angrily at a person and raising a hand (or shaking a fist) in that person's face constitutes an actionable assault insofar as it reflected a credible threat to strike the other person. See, e.g., *Plonty* v. *Murphy*, 82 Minn. 268, 269 (1901) (the defendant-landlord, angry over some refuse left in his yard by the plaintiff-tenant's five year old son, "unceremoniously entered the [plaintiff's] kitchen, where she was at work . . . [and] remained in the house about ten minutes, talking in an excited and angry manner, shook his fist at plaintiff when within striking distance, raised his hand as if he would strike her, and she testified that she was afraid he would strike. His tone of voice was loud . . . . It is quite evident that the defendant unjustifiably intruded himself upon plaintiff by entering the kitchen in which she was at work, and, according to her testimony, became violent in language and threatening in manner. . . . [T]he jury was justified in finding that defendant's behavior was . . . reasonably calculated to create apprehension of present violence, and a fear that he might go further, and commit a battery upon plaintiff's person . . ."); *Howell* v. *Winters*, 58 Wash. 436, 437 (1910) (court approved instruction that "if you believe her testimony that he shook his fist in front of her face angrily and unlawfully, when he was in such proximity to her, as that he could, or might have struck her, also near enough to produce a feeling on her part that she might be struck — that would be an assault"). Compare *Stephens* v. *Myers*, 172 Eng. Rep. 735, 735 (1830) (holding that one who approached another in a threatening and hostile manner, with angry words and a clenched fist, even if "not near enough for any blow," commits "an assault at law").

warrant a conviction for mayhem (under G. L. c. 265, § 14). See *Commonwealth* v. *Davis*, 10 Mass. App. Ct. 190, 196 (1980).

Blacker contends that Ginsberg could not have reasonably had an imminent fear of serious physical harm at the February 3, 2005, confrontation because he had never physically struck or harmed her during the course of their relationship (a fact Ginsberg conceded). The absence of physical harm prior to the abusive incident may be a factor to be considered in the totality of the circumstances but does not remove Blacker's conduct on February 3 from the category of abuse. The facts in *Commonwealth* v. *Gordon*, 407 Mass. at 341-343, are instructive on this issue. There, the court held that "abuse" as defined in G. L. c. 209A, § 1 (in the context of a prosecution for the defendant's violation of a c. 209A order to refrain from "abusing" his wife), could be found on the following facts that did not involve any past or contemporaneous physical abuse or violence:

> "In the present case, there was evidence of a verbal outburst between the defendant and [his wife] five days before the incident in question, during which the defendant called his wife a 'bitch' and a 'whore.' [The wife] testified that, at this time, she was 'upset,' and that she 'didn't know what [the defendant] was going to do next.' At the next meeting between [the wife] and the defendant, on November 15, 1988, the defendant arrived at the house unannounced, and when [his wife] refused to respond to the defendant's requests that she open the door, the defendant said that [she] was being 'immature and ridiculous.' Despite [his wife's] obvious unwillingness to speak with him, the defendant left his automobile when she appeared and prevented [her] from closing the front door by propping his back against it.
>
> "In these circumstances, we cannot say that a jury could not conclude beyond a reasonable doubt that [the wife] entertained a reasonable apprehension that her husband might physically abuse her. The fact that the defendant had violated an order to remain away from the house, the evidence of the tension between the parties, the previous verbal abuse by the defendant, and the defendant's physi-

cal actions in holding open the door when [his wife] clearly desired to avoid contact could reasonably be combined by the jury to create a picture of a volatile situation in which the possibility of physical abuse was present."

*Id.* at 349-350.

The facts in the instant case — Blacker's flying into a rage at an objectively trivial incident (his mistaken perception about his son's haircut), his pulling at his hair while pacing back and forth, his thrusting of his waving hands into Ginsberg's face while screaming at her so uncontrollably as to project his saliva into her face, his pursuing her upstairs and downstairs as she tried to avoid his presence, as well as his obscene verbal abuse, all done in the presence of his young son and against the background of his wishing that Ginsberg and her family "should be shot" for having "ruined his life" — are far more egregiously threatening and violent than those found sufficient to constitute abuse in *Gordon.*[9]

---

[9]Cf. *Commonwealth* v. *Robicheau,* 421 Mass. 176 (1995), also a case turning on whether the defendant had abused the victim as defined in G. L. c. 209A, § 1, which would constitute the common-law crime of assault. The facts there were as follows:

> "There were no allegations that the defendant physically harmed the victim, caused her to engage involuntarily in sexual relations, or attempted to do either. Therefore, any violation of the order to refrain from abuse must have been based on an allegation that the defendant placed the victim in fear of imminent serious physical harm. . . . [T]he jury could have found that the defendant had parked his automobile in front of the victim's home, from which he had been enjoined by court order to remain away. Further, the jury could have found that, when he had previously come to the victim's residence, she had requested that he leave and informed him that his presence was in violation of the [c.] 209A order. The credible evidence was that on this occasion, when the victim made the same request, the defendant got out of his automobile, stood in the middle of the street in front of her residence, yelled obscene language, and made an obscene gesture. He also made an ambiguous statement that he would do exactly as he pleased. He then drove away with a loud, aggressive display. Soon thereafter, the defendant stated over the telephone that he would kill her. . . . In addition, the victim specifically testified that the defendant's conduct scared and upset her. She also testified that she feared he would carry through his stated intention to kill her. . . . In these circumstances, a jury were more than justified in finding beyond a reasonable doubt that the victim's fear was reasonable."

*Id.* at 181-182. The existence of prior c. 209A orders against the defendant in

The reasonableness of Ginsberg's apprehension here also contrasts sharply with those cases where the plaintiff's evidence has failed to establish abuse as defined in G. L. c. 209A, § 1. See, e.g., *Larkin* v. *Ayer Div. of the Dist. Ct. Dept.*, 425 Mass. 1020, 1020-1021 (1997) (sending notices of a future lawsuit and court proceedings insufficient); *Wooldridge* v. *Hickey*, 45 Mass. App. Ct. 637, 639-641 (1998) (conclusory assertions of ex-husband's having been "abusive" and "verbally abusive" without factual details, and with no explanation of why ex-wife felt apprehension of imminent physical harm, except unelaborated "[b]ecause," insufficient); *Uttaro* v. *Uttaro*, 54 Mass. App. Ct. at 874-875 (complainant's fear of being arrested for violating an outstanding c. 209A order insufficient); *Carroll* v. *Kartell*, 56 Mass. App. Ct. at 85-87 (receiving frequent undesired telephone calls and mail from defendant desiring to "cultivate a friendship," without any menacing language or any menacing gestures by him on the few occasions they were together, insufficient); *Szymkowski* v. *Szymkowski*, 57 Mass. App. Ct. 284, 287-288 (2003) (a divorced father's telling his seven year old daughter about peculiar and frightening dreams, tossing a milk container at her, cuffing her under the chin in irritation, kicking the back of her legs in irritation while both were in bed, and pinching her on the arm and leaving a mark, at various times, might be unacceptable parental behavior meriting modification of his custody and visitation rights under the divorce judgment, but were insufficient to establish c. 209A abuse); *Keene* v. *Gangi*, 60 Mass. App. Ct. 667, 669-670 (2004) (placing of hidden video camera in girlfriend's bedroom by boyfriend who had a temper and occasionally said he could have someone "taken care of," insufficient).

The Probate and Family Court judge — undoubtedly experienced with and sensitive to the unfortunate fact that most litigants involved in family disputes and dissolutions are in turmoil, often angry, in their most unreasonable frames of mind, and at their emotional breaking points — had the unrivaled

---

*Robicheau* was echoed in this case, where a number of statements were made regarding two prior restraining orders that Ginsberg had obtained against Blacker. The parties disputed whether they had been subsequently vacated, but that issue was never decided by the judge, and the record does not contain evidence about such orders beyond the transcript references.

benefit of observing the parties at close hand, with the commensurate ability to evaluate their credibility, in light not only of their testimony but also of their demeanor in court. See *Iamele* v. *Asselin,* 444 Mass. at 740; *Vittone* v. *Clairmont,* 64 Mass. App. Ct. at 487. She "was entitled to credit the testimony of the plaintiff" regarding her fear in the attendant circumstances and "to accept the reasonableness of her perception of that fear as a potential prelude to physical harm, particularly in light of . . . the defendant's agitated conduct in court."[10] *Pike* v. *Maguire,* 47 Mass. App. Ct. 929, 930 (1999). The judge's March 4, 2005, abuse prevention order is, accordingly, affirmed.

Ginsberg has requested an award of her appellate attorney's fees. We do not, however, view Blacker's appellate arguments as so egregious, misleading, or foredoomed to defeat as to justify the request. See *Symmons* v. *O'Keeffe,* 419 Mass. 288, 303-304 (1995). Contrast *Avery* v. *Steele,* 414 Mass. 450, 451-453, 455-457 (1993), and cases cited. She is, of course, entitled to her costs in successfully defending against the appeal. See Mass.R.A.P. 26, as amended, 378 Mass. 925 (1979).

*So ordered.*

---

[10]Blacker, in conclusory fashion, asserts that the judge's analysis suffered from a "fatal flaw" in that she used the phrase "fear of imminent serious harm" without the word "physical." Once again, his presentation fails to meet appellate standards, see note 5, *supra*; and we have no doubt that the judge — presented with Ginsberg's affidavit twice alleging that Blacker had "placed me in fear of imminent serious physical harm" and her testimony that "this man has a violent streak" and that she feared "the violence is imminent," as well as Blacker's reiterated protestations that he had never used physical force against Ginsberg (or anyone) in his life and the judge's awareness of the law of assault — could not have failed to be aware of the proper statutory standard regarding physical harm.