## Agnes Smith[1] *vs.* Robert Jones.[2]

No. 08-P-1165.

Middlesex. June 2, 2009. - October 22, 2009.

Present: Cypher, McHugh, & Milkey, JJ.

*Abuse Prevention. Protective Order.*

In proceedings brought by a plaintiff seeking a protective order under G. L. c. 209A, the District Court judge erred in entering an order permanently prohibiting the defendant's contact with the plaintiff (his former girlfriend) and the plaintiff's daughter, where the record did not demonstrate that the plaintiff had a reasonable fear of imminent physical harm to herself at the time the permanent order was entered, and where, even if the record ever demonstrated a reasonable fear of harm to the plaintiff's daughter, the fear did not remain reasonable when the permanent order entered. [543-546] Cypher, J., dissenting.

Complaint for protection from abuse filed in the Concord Division of the District Court Department on January 4, 2006.

A motion for extension of a restraining order was heard by *David W. Cunis*, J.

*Robert D. Canty, Jr.*, for the defendant.

*Gary G. Pelletier* for the plaintiff.

McHugh, J. On this appeal the defendant, whom we shall call Robert, challenges a District Court order permanently prohibiting his contact with the appellee, whom we shall call Agnes, and her daughter. See G. L. c. 209A. Robert is a Florida resident who, at one time, had a relationship with Agnes, a resident of Lexington. We think that the permanent extension was unjustified and order it vacated.

The record reflects that Agnes and Robert, both of whom worked in the same industry and attended the same industry-

---

[1] A pseudonym.

[2] A pseudonym.

wide out-of-town events, had a four-year romantic relationship. Agnes, married and the mother of a young daughter, ended the relationship on or about November 23, 2005. During the period from November 24, 2005 through January 5, 2006, Robert, clearly distressed, telephoned Agnes "thousands" of times and left messages on her voicemail on thirty-eight occasions. Sometimes the voicemail messages were deposited in an intense flurry. For example, on the evening of November 29, 2005, Robert left seven messages, though in a message the following day, he apologized, saying that he had been "drinking a little bit and feeling lonely."

None of the messages contained threats of physical harm. Instead, in each message Robert stated that he did not understand why Agnes was ending the relationship or why she would not speak to him and that he wanted very much to speak to her. On a single occasion, Robert mentioned Agnes's daughter, but that was in the context of saying that he was thinking of Agnes, her father and her daughter on the anniversary of her father's death and in the aftermath of a chest scan Robert, himself, had had.

On January 4, 2006, Robert left a series of messages suggesting that he was going to come to Agnes's home in Massachusetts to talk to her. At that point, she sought a restraining order under G. L. c. 209A. The affidavit Agnes filed in support of her application said that "on or about January 4, 2006 . . . [Robert] called me and said he would come to my home this Friday, January 10th, *to force me into a conversation*" (emphasis in original). Agnes's affidavit also said that "[t]his message was one of hundreds of calls (voicemails) that [Robert] has made to me over the last few months after I explicitly requested that he not contact me again."

Agnes further explained in her affidavit that Robert had "tracked her down" while she was vacationing with her family in Aruba, and while she was on a business trip in the Dominican Republic.[3] Agnes also stated Robert had "tricked" her by posing as a client when telephoning her New York office. In addition, Agnes asserted that Robert directed mail and facsimiles to Agnes's home with fictitious sender information.

The court issued an emergency order on January 4, 2006, and

_____

[3]No specific dates are mentioned.

scheduled an extension hearing for January 12, 2006. On January 5, 2006, Robert left another message, this one stating that he had spoken to a detective (presumably the one who served the order) and apologizing for his calls, saying that he had not intended to frighten Agnes and that he would not call again. Nothing in the record suggests that he ever did.

At Robert's request the extension hearing was continued to February 2, 2006. Robert failed to appear on that date and the court extended the order for one year.[4] On May 10, 2006, Robert filed a motion to vacate the order. The motion was denied and Robert did not appeal.

One year later, on February 1, 2007, Agnes sought a further extension. She filed an affidavit in support of her request, stating that Robert had repeatedly passed by her booth at a March, 2006, New York City trade show, coming within ten feet of her and "smirking."[5] Robert did not appear at the hearing,[6] and a judge ordered a permanent extension of the order. Later, however, Agnes agreed to a modification reducing the term to one year.[7]

Another year passed and then, on April 14, 2008, Agnes filed another motion to extend the order. Robert did not appear at the ensuing hearing but was represented by counsel. Agnes testified, among other things, that she had not been "in touch with"

---

[4]Prior to the hearing, Robert sent a letter to the District Court, asking that the abuse prevention order be dismissed. In the letter, Robert stated (among other things):

". . . I never have threatened any harm or violence on [Agnes] or her family. I feel this all came from a personal misunderstanding. I wish only the best for Ms. [Smith], and I hope [Agnes] knows she has absolutely no reason to fear me in any way. I would like to put this all behind us, and move forward, without any legal issues. I have no history of any type of violence in my life, and I believe this order is completely unnecessary and unwarranted . . . . I assure the court and Ms. [Smith] there is no need for court orders. I thoroughly understand our relationship is over, and I will make no attempt to contact Ms. [Smith]."

[5]Although Agnes's affidavit stated that Robert passed by the booth "repeatedly," her attorney's opposition to Robert's motion to vacate alleged that Robert passed by the booth twice. There is no necessary conflict between the two.

[6]The judge nevertheless referred to Robert's letter of the year before.

[7]In a stipulation modifying the order, the parties expressly provided that neither their agreement nor the modification "shall change in any way the rights of the parties to seek an extension or oppose[] any further extensions of this order."

Robert "for years" but that she was still in fear of him. At the hearing's conclusion, a judge who had not been involved in the earlier proceedings extended the order permanently.

On appeal, Robert challenges only the permanent order of April 14, 2008. He contends there is no reasonable basis for that order because he has never threatened, harmed, or abused Agnes, in any way. Robert also contends there was no evidence to warrant the District Court judge's issuance of a permanent extension of the order insofar as it dealt with the plaintiff's daughter.

*Discussion.* General Laws c. 209A, § 1, provides that the "abuse" for which a protective order may issue can take several forms.[8] The only form applicable here is "placing another in fear of imminent serious physical harm." *Ibid.* That form "closely approximates the common law description of the crime of assault." *Commonwealth* v. *Gordon,* 407 Mass. 340, 349 (1990). Accordingly, "[w]hen a person seeks to prove abuse by 'fear of imminent serious physical harm,' our cases have required in addition that the fear be reasonable." *Iamele* v. *Asselin,* 444 Mass. 734, 737 (2005).

"In determining whether an apprehension of anticipated physical force is reasonable, a court will look to the actions and words of the defendant in light of the attendant circumstances." *Commonwealth* v. *Gordon, supra.* The court looks to actions and words because a *reasonable* fear of imminent serious physical harm is to be determined by an objective standard. The complainant's fears "must be more than 'subjective and unspecified'; viewed objectively . . . 'the plaintiff's apprehension that force may be used [must be] reasonable.' " *Vittone* v. *Clairmont,* 64

---

[8]In material part, G. L. c. 209A, § 1, provides that:

"As used in this chapter the following words shall have the following meanings:

" 'Abuse', the occurrence of one or more of the following acts between family or household members:

"(*a*) attempting to cause or causing physical harm;

"(*b*) placing another in fear of imminent serious physical harm;

"(*c*) causing another to engage involuntarily in sexual relations by force, threat or duress."

Mass. App. Ct. 479, 486 (2005), quoting from *Carroll* v. *Kartell*, 56 Mass. App. Ct. 83, 86-87 (2002).

A person seeking an initial protective order under G. L. c. 209A must show that at the time of the application he or she "suffers from abuse," i.e., that at the time of the application he or she has a reasonable fear of imminent serious physical harm produced by the defendant's words or actions, viewed in light of the attendant circumstances. *Iamele* v. *Asselin, supra* at 737 ("A plaintiff seeking an initial order on the basis of abuse as defined in § 1(*b*) must show that he or she is *currently* in fear of imminent serious physical harm . . . as well as that the fear is reasonable") (emphasis in original). To obtain an extension of the initial order, he or she must make the same showing, i.e., that he or she has the same reasonable fear at the time the extension is sought. *Id.* at 739. However, "no presumption arises from the fact that a prior order has issued; it is the plaintiff's burden to establish that the facts that exist at the time extension of the order is sought justify relief." *Smith* v. *Jones*, 67 Mass. App. Ct. 129, 133-134 (2006). See also *Dollan* v. *Dollan*, 55 Mass. App. Ct. 905, 906 (2002) ("G. L. c. 209A, § 1(*b*), focuses on preventing imminent serious physical harm, not merely responding to past abuse").

In acting on an original G. L. c. 209A application or an application for an extension, a judge has wide discretion, see *Iamele* v. *Asselin, supra* at 742, and can properly take into account the entire history of the parties' relationship, see *Pike* v. *Maguire*, 47 Mass. App. Ct. 929, 930 (1999), and any trauma or threat of harm to the applicant's minor children. *Vittone* v. *Clairmont, supra* at 489. Moreover, when faced with an extension request, the judge is not limited to issuance of a permanent extension or none at all. The statute permits extensions for "such additional time as [the judge] deems necessary to protect [the plaintiff] from abuse," G. L. c. 209A, § 3, as appearing in St. 1983, c. 678, § 4, thus leaving "to the discretion of the judge the time period of any extension of an initial abuse prevention order." *Crenshaw* v. *Macklin*, 430 Mass. 633, 636 (2000).

Here, there was sufficient evidence to establish that, at one time, Robert had been stalking Agnes, itself potentially criminal behavior. See G. L. c. 265, § 43(*a*). Moreover, there was evidence that Robert called Agnes and came near Agnes at a trade show even after a restraining order had issued. Though

there is no suggestion that violence or threats thereof were any part of the relationship between Agnes and Robert, and although Robert never made an explicit threat of violence after the relationship ended, the evidence of his compulsive contacts even in the face of Agnes's request that he refrain was of sufficient intensity to permit the judge to conclude that Agnes was in reasonable fear of physical harm.

As the record makes clear, however, Robert's improper behavior was directly tied to his refusal in the immediate aftermath of the breakup to accept that his lengthy romantic relationship was over and that Agnes preferred to stay with her husband. Robert made no telephone calls after his January 5, 2006, promise that he would call no more,[9] and the trade show incident occurred more than two years before the April, 2008, extension hearing. Thereafter, the record demonstrates no contacts of any kind, and Agnes said that she had not heard from Robert "in years," even though in the intervening period she had attended trade shows where she "assumed" Robert was present.[10] Nor is there any evidence in the record that Robert was inherently incapable — with the passage of years — of accepting the reality that his relationship was over. Even considering that the intensity of Robert's immediate post-breakup telephone calls and other activities permitted a finding that Agnes had a reasonable fear of imminent serious physical harm in the absence of overt threats, nothing in the record suggests that Robert's intensity persisted for the two-year period between January, 2006, when the original order entered, and April, 2008, when Agnes sought the permanent order.

On this record, the defendant's improper behavior was directly tied to his refusal to accept that the couple's lengthy romantic relationship was over and that the plaintiff preferred to stay with her husband. As this case well illustrates, making a judgment as to when a previously justified fear ceases to be reasonable can be

[9]The dissent says that there was no "proper evidence" of the promise. See *post* at n.4. There was. Robert made the promise in a January 5, 2006, telephone call that was recorded, transcribed and introduced by Agnes at the first extension hearing and used by Agnes to show a violation of the initial order.

[10]We recognize that "[t]he fact that abuse has not occurred during the pendency of an order shall not, in itself, constitute sufficient ground for denying or failing to extend the order, of allowing an order to expire or be vacated, or for refusing to issue a new order." G. L. c. 209A, § 3. But the provision surely does not make the absence of abuse irrelevant.

difficult. As a general matter, it is important that we defer to the judge who heard the evidence in making these sorts of difficult assessments. Here, however, the judge's decision to enter a permanent order cannot reasonably be justified by the record that existed when that order entered. In view of the fact that it has now been almost four years since the breakup, we decline to remand the case for reconsideration. In the event that the plaintiff continues to believe that she has an objectively reasonable fear of imminent physical violence, she is free to file a new petition.

In sum, we think that the record does not demonstrate that Agnes had a reasonable fear of imminent physical harm to herself when the permanent order was entered in April, 2008, nor do we think that, even if the record had ever demonstrated a reasonable fear of harm to her daughter, the fear remained reasonable at the time the permanent order entered. Accordingly, entry of the permanent order was error.[11]

*Order vacated.*

CYPHER, J. (dissenting). I respectfully dissent because the majority's decision improperly invades the judge's "broad" discretion in issuing the permanent order in this case. *Crenshaw* v. *Macklin*, 430 Mass. 633, 635 (2000).

"The inquiry at an extension hearing is whether the plaintiff has shown by a preponderance of the evidence that an extension of the order is necessary to protect her from the likelihood of 'abuse' as defined in G. L. c. 209A, § 1. [Citation omitted.] Typically, the inquiry will be whether a plaintiff has a reasonable fear of 'imminent serious physical harm.' G. L. c. 209A, § 1(*b*)." *Iamele* v. *Asselin*, 444 Mass. 734, 739-740 (2005).

After the hearing, the judge stated:

> "I'm going to issue a permanent order. I think that although there's been no physical abuse of any kind, I think that the testimony [the plaintiff] offers and . . . given her demeanor on the stand, it's quite clear that she is certainly in fear of imminent physical harm, not knowing where [the defendant] is or what he could do to her at any time, whether he could appear in her life at any time unexpectedly."

---

[11]The plaintiff seeks attorney's fees. In light of our result, her request is denied.

Because a "plaintiff seeking an extension of a protective order must make a showing similar to that of a plaintiff seeking an initial order," *Iamele* v. *Asselin, supra* at 734-735, the plaintiff submitted affidavits and evidence from the several previous hearings. In highly summarized form, that evidence revealed that the defendant initially stated in a telephone message that he would come to the plaintiff's home to "force [her] into a conversation"[1]; then subsequently tracked her while on a family vacation in Aruba and while on a business trip to the Dominican Republic; called her and appeared outside her office in New York City; and then repeatedly came by her booth at a trade show in New York City. The plaintiff reported that violation to the New York police.

The defendant asserts that it was unwarranted for the judge to conclude that the plaintiff had fear of "imminent physical harm" because there was no evidence of physical abuse, and that the plaintiff's fear is only "generalized apprehension." To the contrary, the defendant's conduct was at least confrontational, intimidating, and menacing. Unlike *Carroll* v. *Kartell*, 56 Mass. App. Ct. 83, 86-87 (2002), where evidence of persistent telephone calls and other unsolicited efforts to establish contact without menacing language or gestures was insufficient, here the defendant's tracking of the plaintiff was sufficiently menacing to warrant her fear. While such tracking was not as close up or dramatically confrontational as in *Ginsberg* v. *Blacker*, 67 Mass. App. Ct. 139, 146 (2006), it had an insidious quality readily supporting the plaintiff's reasonable apprehension of fear from the defendant's "history of harassment, stalking[2] and pattern of erratic and unstable behavior." Moreover, the judge had the benefit of evaluating the plaintiff's credibility through her testimony and demeanor, and was entitled to credit her testimony concerning her fear. See *Pike* v. *Maguire*, 47 Mass. App. Ct. 929, 930 (1999).

---

[1] This was one of what were alleged to be "hundreds of calls." Thirty-nine of those calls were transcribed, and submitted at the hearing. A fair reading of the transcriptions indicates the defendant's torment over the ending of the parties' relationship and the plaintiff's apparent refusal to talk to him. No threats appear, but the defendant acknowledged the plaintiff's fears and recognized her being "scared" of him.

[2] The majority acknowledges that there was sufficient evidence that the defendant had been stalking the plaintiff, potentially constituting criminal behavior under G. L. c. 265, § 43(*a*).

The judge also properly considered other factors such as the defendant's violation of a protective order, and the likelihood that the parties will encounter one another in the course of their employment, in evaluating the risk of future abuse if the order should expire. See *Iamele* v. *Asselin, supra* at 740.

"We have no difficulty in upholding the judge's implicit finding[] that [the defendant's] conduct, by word and act, . . . was not only 'menacing by objective standards,' *Commonwealth* v. *Slaney*, 345 Mass. 135, 140 (1962), but created an apprehension of imminent serious physical harm on the part of [the plaintiff] that was objectively reasonable." *Ginsburg* v. *Blacker*, 67 Mass. App. Ct. at 143.[3]

The majority notes that the defendant promised he would make no more telephone calls after January 5, 2006,[4] and the record demonstrates no further contacts with the defendant after the April, 2008, hearing. From this, the majority appears to conclude that there is no need for a permanent extension of the order. Such a conclusion ignores the potential consequences of not extending the order. "The fact that abuse has not occurred during the pendency of an order shall not, in itself, constitute sufficient ground for denying or failing to extend the order." G. L. c. 209A, § 3. That language "acknowledges the reality that, in some cases, respondents will obey the initial order, and that obedience alone is not a ground for refusing an extension of the initial order." *Iamele* v. *Asselin*, 444 Mass. 734, 738 (2005).[5] While the restraints of the order are not a guarantee that the

---

[3] "We note that, for G. L. c. 209A purposes, the conduct proscribed as abuse 'closely approximates the common-law description of assault' [citations omitted]. Under the common law, 'it is well established in this State that an act placing another in reasonable apprehension that force *may* be used is sufficient for the offense of criminal assault' (emphasis added). [Citation omitted.]" *Ginsberg* v. *Blacker, supra* at 142-143.

[4] The source of this information was not proper evidence in support of the defendant's case. The defendant, who did not appear at any of the hearings in the District Court, wrote two apologetic letters to the judge, essentially urging that there was no need for court orders. The judge made no rulings on the letters but used their receipt as proof of service. The defendant also did not appeal from the initial order or its extensions.

[5] The plaintiff requested a no-contact order for her child, stating: "I am afraid [the defendant] would try to force contact with me thru [sic] my daughter." No good reason appears to disturb the inclusion of that order in all the orders issued in the District Court.

forbidden contact will not occur, the plaintiff should not be exposed to the uncertainty of whether, in the absence of the order, the defendant will repeat such contact.