The defendant appeals from a District Court order dated February 17, 2017 (the order), extending for one year an initial ex parte abuse prevention order issued pursuant to G. L. c. 209A. The defendant argues that at the evidentiary hearing at which both parties testified, the plaintiff (his former wife) failed to introduce sufficient evidence to support the order. We disagree and therefore affirm the order.
As the judge made no findings, "we consider whether the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant had committed" abuse within the meaning of G. L. c. 209A. Gassman v. Reason, 90 Mass. App. Ct. 1, 7 (2016) (same, regarding order under G. L. c. 258E). One such form of abuse is "placing another in fear of imminent serious physical harm." G. L. c. 209A, § 1, amended by St. 1990, c. 403, § 2. When this type of abuse is at issue,
"[t]he judge must focus on whether serious physical harm is imminent and should not issue a c. 209A order on the theory that it will do no harm, i.e., 'seems to be a good idea or because it will not cause the defendant any real inconvenience.' Wooldridge v. Hickey, 45 Mass. App. Ct. [637,] 639 [ (1998) ], quoting from Smith v. Joyce, 421 Mass. 520, 523 n.1 (1995)."
Carroll v. Kartell, 56 Mass. App. Ct. 83, 87 (2002). "Generalized apprehension, nervousness, feeling aggravated or hassled" is insufficient. Wooldridge, 45 Mass. App. Ct. at 639. "[O]ur cases have required in addition that the fear be reasonable." Iamele v. Asselin, 444 Mass. 734, 737 (2005).
Here, the parties had been married for three and one-half years, the plaintiff filed for divorce in August of 2016, and a judgment of divorce nisi issued on November 30, 2016. The plaintiff sought the G. L. c. 209A order in early February, 2017. Her affidavit recited, among other things, that the defendant, on three different occasions during their marriage, had been physically abusive to her while intoxicated, including by throwing beer bottles. The affidavit further stated that he had been sending "threatening" electronic mail messages (e-mails) and text messages for months and had "threatened [her] physical and mental safety."
At the evidentiary hearing on the extension of the ex parte order, the plaintiff proceeded pro se; the defendant was represented by counsel. The plaintiff testified that the defendant had been "abusive emotionally and at times physically" during their marriage. On one occasion in November, 2015, she "was driving him home and he was black-out drunk and he punched [her] in the leg." After she filed for divorce, he had sent her "thousands of text messages, e-mails and phone calls of an harassing, disturbing, threatening nature." Asked by the judge for details about those messages that the plaintiff "took as a threat to physically harm" her, she read some of them out loud, from August and September, 2016:
"I'm going to bring this TDO[2] back and put ten thousand bullet holes in it. I'm going whacky, fucking nuts. God fucking damn. Eat shit. Wait 'til that cunt sees what I did.
"...
"You better tell your buddies I want my punching bag back or they will be my punching bag. That was mine.
"...
"Rage. I'm so fucking mad anyone in my way will feel the devil. Rage. Rage. I know I will spend the rest of my life in jail. Rage. I'm so mad. Hate is a strong word. You and your cross-fit boyfriend better stay away from me, please. I will end up in jail. You guys stay away. I'm very mad. Leave me alone.
"...
"Please don't get a restraining order. That will only make things worse."
In early January of 2017, after the plaintiff informed the defendant that she did not want their wedding photographs any more, he sent her a video showing him dousing the photographs with gasoline and burning them, making "a very large fire." Accompanying the video was a message saying, "Look what you did now. I hope you are happy now."
The most recent incident was on Sunday, February 5, 2017, at 9 A.M. The plaintiff testified that the defendant had shown up at her front door. She "argued with him for probably two to three minutes telling him he didn't belong [t]here, [she] didn't want him [t]here," but he verbally "coerced" and "manipulate[d]" his way in, saying "[h]e just wanted to talk." She testified that, once inside:
"He kept grabbing me. I was walking all around my apartment.... [H]e cornered me[,] hugging me. I was pushing him away. He followed me into my living room. Everywhere I went, he followed me and kept hugging me and grabbing me. And then he pulled my pants down."
She went into the bathroom, "overwhelmed and stressed and [not knowing] what to do"; she put her pants back on.
When she came out of the bathroom, "he was laying in [her] bed naked." "He wasn't leaving until [she] had sex with him." She "continually said [she] was not having sex with him," that she "didn't want to have sex with him," and that she "didn't want to see him" and "he had no business being there." She went over to the bed and he took her shirt off. "He was not leaving unless [she] had sex with him." "It just happened."
Defense counsel pressed the plaintiff:
Q: "Did your ex-husband physically force you to have sex?"
A: "It is a pretty gray area."
Q: "I'm going to suggest it is a yes or a no. Did he force you physically to have sex?"
A: "Yes."
Defense counsel followed up, asking among other things if the defendant had threatened the plaintiff, to which she replied, "[h]ave you seen the man's size? ... He was not leaving my apartment." "You see the size discrepancy here? ... He was following me around my apartment hugging me, smothering me as I pushed him away." Eventually, he left. The next day, the plaintiff applied for the G. L. c. 209A order.
The plaintiff further testified that she remained "concerned about [her] physical safety," whether in her apartment or at the grocery store; she was "scared to go about life because [she didn't] know where he's going to turn up. He's not a stable man."
Defense counsel was able to elicit other statements from the plaintiff that undercut or even contradicted some of the testimony recounted above. The defendant also testified, stating that he had never threatened or physically harmed the plaintiff and that all of their sexual activity was consensual. Had the judge chosen to credit these statements, no order would have been appropriate.
Nevertheless, it was for the judge to evaluate the demeanor and credibility of the witnesses, to decide whom to believe and which parts of each witness's testimony to believe. We cannot second-guess those determinations. A judge is not required to wait for an actual incident of serious physical harm to occur before concluding that a plaintiff reasonably fears that such harm is imminent and that issuance of the order is warranted. We therefore affirm the order dated February 17, 2017.
So ordered.
Affirmed.

The record gives no further explanation of the acronym "TDO."