NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-286

M.B.

vs.

A.G.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On December 30, 2020, M.B. applied for an abuse prevention order against her estranged husband, A.G., pursuant to G. L. c. 209A, § 3. In her application, M.B. alleged that A.G. had on multiple occasions sexually assaulted her and had bitten her and their son. A District Court judge issued a temporary ex parte order that day and then -- following a two-party virtual hearing -- the judge issued a one-year order due to expire on January 13, 2022. The order subsequently was extended on two occasions, most recently for an additional two years by an order issued after an evidentiary hearing held on February 8, 2023. A.B. now challenges the order allowing that extension, arguing principally that M.B. failed to provide sufficient evidence to show that she had an objectively reasonable fear of imminent serious physical harm. A.G. additionally argues that the judge

should not have considered evidence that A.G. allegedly violated the order, because his actions constituted protected speech. We affirm.

Background. We summarize the evidence before the judge. The parties met in May 2015 and began dating. A few weeks into their relationship, A.G. sent the plaintiff a photograph of the two of them taken while M.B. was asleep. The caption read, "I'm going to kill you . . . ." A.G. testified that he intended the message as a joke.

The parties married in 2018, and their son was born in 2019. In 2020, tensions began to escalate between the parties. Two primary issues in the marriage were A.G.'s "sexual aggression" toward the plaintiff and his alcohol use. In June 2020, A.G. attended an alcohol rehabilitation program in Arizona. During that month, the parties exchanged a series of email messages in which A.G. acknowledged -- in the context of his asking M.B. for forgiveness -- that he was "sexually abusive" to her, which he attributed to his "screwed up history with sex." M.B. had listed specific instances of A.G.'s sexual aggression, which she referenced as "sexual abuse" and a "violation of [her] body." Although M.B. noted that A.G.'s behavior had "gotten a lot better," she expressed that she still felt "immediate anxiety" when A.G. initiated sex. Her fear of A.G. rose to the point where she was afraid to even hug him.

2

In July of 2020, M.B. found a bite mark on their son's arm. She took him to see a doctor, who could not determine if the bite was caused by a human but nevertheless reported the matter to the Department of Children and Families (DCF). A DCF social worker contacted the parties regularly over the following weeks in an effort to ensure the boy's safety. Both parties told the social worker that A.G. regularly bit the son. According to A.G., he bit the child as a joke but unintentionally may have bitten him too hard on that occasion. A.G. later claimed that he had not acknowledged such biting to the social worker and attempted to suggest that the bite may have occurred at the son's day care. The social worker concluded that A.G. was not able to provide for the child's safety and that the child was safest with M.B.

In spite of this, the parties remained in a relationship through September 2020. According to M.B., "sometimes things were good, and sometimes things weren't." The parties were considering having another baby.

In December 2020, the relationship took a turn for the worse. When M.B. told A.G. in early December that she wanted a divorce, he threatened to leave with their son. Before leaving their home, M.B. called the police, telling them that A.G. was suicidal. A.G. voluntarily admitted himself to the hospital, and while he was there, M.B. left the home with their son.

After returning home from the hospital, A.G. filed a police report alleging that M.B. had "cleaned out their bank accounts."

M.B. filed her application for an abuse prevention order in District Court shortly after A.G. returned from the hospital. On the preprinted application form, M.G. checked a box stating that A.G. had "[p]laced [her] in fear of imminent serious physical harm."  She added that she was afraid of A.G. because he had threatened to kill himself and "becomes violent and suicidal when he is angry."  M.B. did not check the boxes stating that A.G. had "[c]aused [her] physical harm" or "[c]aused [her] to engage in sexual relations by force, threat, or duress."  However, in the affidavit supporting her application, she swore to several instances of past physical and sexual abuse.  For instance, she said that when A.G. wanted to have sex and she said no, he "grab[bed] [her] breasts and [her] butt," restrained her, and "pushe[d] [her] towards the bed and floor."  She also stated that A.G. would continue to have sex with her even after she told him it hurt and asked him to stop. In addition to the violence during sexual intercourse, M.B. described times that A.G. hit her breasts to the point where she cried, hit her on the buttocks hard enough to leave a welt, and bit her hard enough to leave a bruise.

A District Court judge issued a temporary abuse prevention order prohibiting A.G. from contacting M.B., and it ordered him

4

to maintain a one hundred foot distance from her.  Following a two-party hearing, the judge issued a one-year order, which was extended for an additional year.  In a parallel divorce proceeding, a Probate and Family Court judge issued a temporary order that granted M.B. physical custody of the son, while maintaining joint legal custody.  That same order prohibited disclosure to A.G. of the addresses where M.B. lived and worked, as well as the location of the son's daycare.

In April of 2021, A.G. posted a photo on Facebook of their son as an infant, with a caption consisting of a quote without attribution that read, "The wicked are ensnared by the works of their hands."  A.G. testified that this was a biblical reference meant to convey that "justice [had] prevail[e]d" in their divorce proceedings with respect to custody.[1]  M.B. found the post "disturbing," and she viewed it as a threat.  In March of 2022, the judge in the divorce proceeding issued a temporary order under which "[a]ll communications between the parties are limited to [the subject of] the child and shall be done through [an application known as] Our Family Wizard" (OFW).

A.G. claimed that as of April 2022, he believed that he and M.B. "had turned a corner" in their communications.  According

_____

[1] A.G. also said he believed M.B. would understand the biblical reference because she had a master's degree in theology.

5

to him, the parties were "sending pictures [of their son] back and forth," and having light-hearted discussions about him. The next month, A.G. sent M.B. a message through OFW which he ended by saying, "I like the glasses!" (in apparent reference to M.B.'s new eyeglasses). The day after that message, the parties met at a police station, the required location for exchanging custody of the son for his visits with A.G. During that encounter, A.G., while crying and standing between M.B. and the exit, addressed M.B. by telling her that he wanted to make her happy.[2] M.B. testified that this incident scared her. Shortly thereafter, A.G. sent a message to M.B. through OFW, ending with "Happy May 16th, . . . sigh." (in apparent reference to the anniversary of their first date). M.B. testified that this made her "feel sick."[3]

Tensions between the parties continued to escalate and culminated in a series of messages sent between November 2022 and January 2023. According to the most recent temporary order issued in the divorce proceeding, M.B. was allowed to cancel visits between A.G. and the son for nonemergency reasons, with

---

[2] A.G. contested this version of events and testified at the February 2023 hearing that he said he wanted to make "everybody" happy, not M.B. specifically.

[3] M.B. reported the messages and the incident at the police station as a violation of the abuse prevention order. A complaint issued, but the charges eventually were dismissed.

6

the provision that she reschedule them within sixty days. On November 11, 2022, A.G. sent M.B. a message asking her to explain why she had canceled one of his visits with their son on August 23, 2022. On January 5, 2023, A.G. sent another message, demanding a reason for the cancellations and asking if M.B. had taken their son out of the State. Seven minutes later, he sent another message, saying, "[W]e have joint legal custody, and this information you can't withhold." Later that month, M.B. again canceled A.G.'s time with their son. Suspecting that M.B. had gone to out of State with the son to visit her parents, A.G. sent M.B. a message on January 13, 2023, saying he hoped they "both make it home safely." According to A.G., he was merely expressing concern for M.B.'s safety, in part because he surmised that M.B. had taken the son to visit her parents even though she previously had told him she was sexually abused by her grandfather and physically abused by her mother. After sending the message, A.G. confirmed that M.B. had gone out of State to visit her family by looking at M.B.'s Google calendar. M.B. had taken steps to block A.G.'s access to her Google calendar, but those steps apparently were not successful.

M.B. viewed the message from A.G. not in the light he claims it was intended, but as a threat. She was especially concerned to think that A.G. seemed to be tracking her

whereabouts, which he was not supposed to know.[4]  This made her "deeply disturbed and scared," and she filed a report with the local police department on January 18, 2023.[5]  As she explained during her testimony at the February 2023 hearing, she interpreted the message from A.G. as communicating:  "I know what you're doing and where you are, and when you're doing it . . . he was saying he's watching me, and I didn't know how."

By order docketed on February 10, 2023, a District Court judge extended the abuse prevention order for another two years. The judge found that "plaintiff [] met her burden," without providing further explanation.

Discussion.  In the current appeal, A.G. challenges only the February 2023 order extending the abuse prevention order for an additional two years.  We review the trial court judge's decision for abuse of discretion or other error of law.  E.C.O. v. Compton, 464 Mass 558, 562 (2013).  Where an extension of an abuse prevention order has been granted, in reviewing the

---

[4] At this point, M.B. had taken numerous steps to ensure that A.G. did not know her location.  Shortly before her trip out of State, she bought a house and worked with the Massachusetts Address Confidentiality Program to ensure that her name would not be associated with her address.  However, her new address was listed in her Google calendar, which she did not know A.G. still could access.

[5] The police in fact sought a criminal complaint charging the defendant with another violation of the abuse prevention order.  Although a complaint issued, it was subsequently dismissed on A.G.'s motion, without explanation.

sufficiency of the evidence, we view the evidence in the light most favorable to the plaintiff. Szymkowski v. Szymkowski, 57 Mass. App. Ct. 284, 285 n.4 (2003). This means, among other things, that we disregard A.G.'s denials and his claims that his actions were intended as a joke. Where a reviewing court is "able to discern a reasonable basis for the order [. . .] no specific findings [from the issuing judge] are required." G.B. v. C.A., 94 Mass. App. Ct. 389, 396 (2018). A.G. makes two arguments, which we address in turn.

1. Sufficiency. We begin by noting that where applicants can demonstrate that they suffered actual or attempted physical or sexual harm, their burden is somewhat lessened than for those who are claiming a reasonable fear of imminent serious physical harm. See Callahan v. Callahan, 85 Mass. App. Ct. 369, 373 (2014), quoting Iamele v. Asselin, 444 Mass. 734, 740 n.3 (2005) ("[i]f a plaintiff were suffering from attempted or actual physical abuse or involuntary sexual relations, there is no question that an extension should be granted"). See also G. L. c. 209A, § 1 (defining "abuse" as "attempting to cause or causing physical harm," "placing another in fear of imminent serious physical harm," or "causing another to engage involuntarily in sexual relations by force, threat or duress"). Although there plainly was evidence before the judge that M.B. suffered "actual physical abuse or involuntary sexual relations"

at the hands of A.G., Iamele, supra, A.G. suggests that our review is confined to whether she can prove continued fear of imminent serious physical harm, because that was the only stated basis of her initial request (based on which box she checked on the preprinted form).  We are not persuaded.

There was nothing hidden about the nature of M.B.'s factual allegations.  Her supporting affidavit contained information about both her fear of future harm and the past physical harm she and their son suffered at the hands of A.G.  It described in detail the various forms of unwanted physical and sexual touching to which A.G. subjected her, including forcibly grabbing intimate areas of her body and continuing to have sex with her when she refused.  At least where, as here, a defendant is unable to claim unfair surprise, we do not view a party's failure to check the applicable boxes as limiting our review.

Moreover, even if the judge's review had been limited to whether M.B. had demonstrated that she had an objectively reasonable, subjective fear that A.G. would cause her imminent serious bodily harm, there was ample evidence to support that finding, including the evidence of the past physical and sexual abuse she suffered.  Contrary to A.G.'s arguments, the judge not only could consider the factual record previously established in weighing whether to extend the order, he was required to do so. See Iamele, 444 Mass. at 740 ("In evaluating whether a plaintiff

10

has met her burden, a judge must consider the totality of the circumstances of the parties' relationship").  The evidence that M.B. had suffered past physical and sexual abuse by A.G. was ample.  Indeed, A.G. acknowledged in his June 2020 email message that he was "sexually abusive" to her.  This included the forcible sex referenced above, as well as acts such as hitting M.B.'s breasts with enough force to make her cry and biting her "hard enough to leave a bruise."  Given the severity of the abuse she suffered, M.B.'s statements that she felt "scared" and "on edge" when A.G. blocked her exit in the police station in May 2022, and that she was "deeply disturbed and scared" when A.G. sent her the January 2023 message suggesting he knew that she was out of State, were sufficient to show her subjective fear.

A.G.'s history of abuse toward M.B. also made her fear objectively reasonable.  See Vittone v. Clairmont, 64 Mass. App. Ct. 479, 487 (2005) ("[T]he nature and duration of a relationship, as well as any prior history of violence, threats, or hostility within it" are necessary contexts "for assessing the reasonableness of an applicant's fear of imminent serious physical harm").  There was ample record evidence on which the judge could conclude that it was reasonable for M.B. to continue to fear imminent serious physical harm from A.G. when he blocked her exit at the police station and when he suggested he knew how

11

to find her.  He in fact acknowledged the actions he took to track down where she was living.

2.  <u>First Amendment</u>.  A.G. separately argues that the judge could not consider statements that he had made to M.B. that she claimed had placed her in fear, because those statements encompassed speech protected by the First Amendment to the United States Constitution.[6]  There is no merit to this argument. "While an abuser has a right to speak his mind freely in any number of forums, he has no right to seek out and contact the victim of his abuse, forcing that victim to endure his unwanted and destructive presence in her life."  <u>Commonwealth</u> v. <u>Thompson</u>, 45 Mass. App. Ct. 523, 525 (1998).

<u>Extension order entered February 10, 2023, affirmed</u>.

By the Court (Milkey, Henry & Desmond, JJ.[7]),

Assistant Clerk

Entered:  April 26, 2024.

---

[6] In fact, A.G. argues that the dismissal of the criminal charges that he had faced for allegedly violating the abuse prevention order somehow conclusively establish the protected nature of the actions he had taken.  Putting aside that the reason why the charges were dismissed is not apparent on the record before us, any determination made by the judge in that proceeding would not be binding on M.B., who was not a party to the criminal case.

[7] The panelists are listed in order of seniority.

12