CONSTANCE C. vs. RAYMOND R., 101 Mass. App. Ct. 390

 
 CONSTANCE C. [Note 1] vs. RAYMOND R. [Note 2]

101 Mass. App. Ct. 390
 May 3, 2022 - July 15, 2022

Court Below: District Court, Springfield Division
Present: Meade, Shin, & Hershfang, JJ.

 

No. 21-P-635.

Abuse Prevention. Protective Order.

A District Court judge neither erred nor abused his discretion in extending an abuse prevention order issued pursuant to G. L. c. 209A, § 3, where the plaintiff's description of the defendant's nonstop attempts to contact her, his escalating anger, his terrifying and increasingly aggressive behavior, his tendency toward violence when under the influence, and his threats to commit suicide permitted the judge, who had the benefit of evaluating the plaintiff's credibility, to conclude that the plaintiff's fear of an imminent risk that the defendant would physically harm her was objectively reasonable. [394-397]

Complaint for protection from abuse filed in the Springfield Division of the District Court Department on December 23, 2020. 

 Motions to extend a protective order and to terminate the order were heard by Philip A. Contant, J.

 Tara Morrison for the defendant.

 MEADE, J. The defendant, Raymond R., appeals from the extension of an abuse prevention order issued pursuant to G. L. c. 209A, § 3. [Note 3] He claims that the plaintiff, Constance C., failed to prove by a preponderance of the evidence that her fear of imminent serious physical harm was objectively reasonable; he argues that he threatened only himself with physical harm, the judge improperly considered the defendant's threats to commit suicide, and the judge failed to focus on whether the proper standard for extending an order had been met. We affirm.

 Page 391 

 Background. [Note 4] The judge was entitled to find the following facts: The parties, who were in college during these proceedings, had dated on and off for a number of years beginning when they were in high school. When the plaintiff would break up with him, the defendant would send her lengthy e-mail messages, and he would have both his and her siblings call her. She attempted to block his calls, but she kept going back to him because she loved him and "wanted to make things work." In October 2019, the defendant ended the relationship, which he described as "toxic." The two were out of touch for about five months, after which they were on good terms and, before November of 2020, were on "the cusp of getting back together," but the plaintiff was "still reeling" because the defendant had cheated on her on multiple occasions. 

 In November 2020, the defendant invited the plaintiff to come to his apartment; she repeatedly declined. Soon afterwards, the defendant contacted the plaintiff to inform her that he was at an intersection near her house. The plaintiff asked why he was there, and the defendant said he was "coming to get [her]." She told him she did not want to go with him. The defendant then sent her a photograph to indicate his presence; she did not respond, but the incident "freaked [her] out" because she "had told him repeatedly" not to come. After the defendant's visit to her house, the plaintiff requested that he stop "hounding" her, and she told him that she no longer had a romantic interest in him, which the defendant did not understand. At the defendant's request, the plaintiff explained her lack of romantic feelings for him on "FaceTime," [Note 5] and later in person at a Walmart. 

 In late December 2020, the defendant sent to the plaintiff two unsolicited text photographs of his genitals. When the plaintiff asked him not to send her such things, the defendant laughed and said he was drunk. Thereafter, the defendant insisted on giving the plaintiff a television as a Christmas present. This made her uncomfortable. During discussions with the defendant, the plaintiff asked him to take her to a doctor's appointment, and he agreed. The defendant was not being aggressive towards her at this point. She thought they were on a "friendly basis." Later, the plaintiff realized it was a mistake to have asked for the ride. 

 Page 392 

 After the appointment, the defendant brought the television to her house. Later, because she still felt uncomfortable keeping the gift, she reached out to the defendant to tell him she did not want to keep the television; she told him that he could come get it, or she would bring it to his sister's house. This made the defendant angry, and he wanted to know why she would not accept his gift. The plaintiff explained that she feared he would want sex from her in exchange for the gift. Hearing this sent the defendant into a jealous rage, and he asked her if she was dating someone else. She both denied dating anyone else and told the defendant that it was none of his business. The defendant did not believe her, insisted that she tell him or he would get upset, and said that if he found out through someone else, he would get "really angry." 

 As the defendant's "pestering" continued, the plaintiff said she was "talking" to someone, but not dating this person. When she finally told him she was dating someone, he "got really angry," and he "explo[ded]." He said he thought that the plaintiff loved him and that they were going to have a life together. For the twelve hours preceding her application for the abuse prevention order, the defendant called the plaintiff an "overwhelming" number of times and and sent her text messages over 200 times. In the texts, the defendant did not directly threaten the plaintiff, but rather, he berated her for refusing to have a relationship with him, and he threatened suicide. He said he "would join the military so he could get shot." He also threatened to ingest anthrax "because he wanted [her] to be with him." He said that "he saw a life with [the plaintiff]" and "[he] saw [them] having children." The defendant called her cell phone so often that the plaintiff testified that she could not use it to "call for help." The plaintiff testified further that with the incessant calls and the fact that he knew where she lived, and given her petite build, she was "so scared." [Note 6] 

 Despite her pleas for him to stop contacting her, the defendant would not. He contacted her on Facebook, Instagram, iMessage, and through e-mail. The defendant "was coming at [the plaintiff] from every angle." The plaintiff testified that the defendant "just kept going, and he kept calling -- he kept talking about the boys that I had told him I was with when we were broken up -- when he had broken up with me, and he had told me that he had contacted them. And I, honestly -- he had already arrived [at] my 

 Page 393 

house that day, and he . . . has shown up in the past when I told him not to." The plaintiff even contacted the defendant's best friend and his brothers to attempt to calm him down, but this caused his anger to escalate. The intensity of his anger was "raging." [Note 7] 

 Although the defendant had not hurt her physically in the past, the plaintiff did state that the defendant did not "understand the word 'no' multiple times in sexual encounters." There was also an occasion in the summer of 2019 when the defendant was drunk, and he attempted to force her "to give him oral sex." When the defendant was under the influence, the plaintiff testified, his behavior became unpredictable, "terrifying," and "violent." 

 The judge granted the extension order. At the hearing on the motion to terminate, the judge noted that given the defendant's nonstop attempts to contact her, his escalating anger, [Note 8] and his threats to commit suicide, the plaintiff was reasonably in fear of imminent serious physical harm from the defendant. At the end of the extension hearing, the judge stated that both parties have the potential for "good future[s]" and that they "should go [their] separate ways . . . and get on with things without any contact with each other." 

 At the conclusion of the evidentiary hearing on the motion to modify or terminate the abuse prevention order, the judge stated:

 "[T]his was a difficult decision for me the first time when I heard from both parties when they were pro se, and it still remains a tough decision in my mind.

 "Although, I do think that the -- that there is sufficient evidence to meet the legal standard that -- that given kind of the excessive, nonstop type of contact that the defendant was attempting to make, the threat . . . to commit suicide, even though maybe that was a threat to commit self-harm in the context of all this messaging, I do find that that was an escalating aggressiveness directed at . . . the plaintiff.

 "And I do find that there is sufficient evidence to -- for her 

 Page 394 

to be reasonably in fear of imminent serious physical harm now." (Emphasis added.)

The judge denied the motion to terminate the order. [Note 9] He added that he hoped that things would calm down and that it would not be necessary to extend the order in the future. 

 Discussion. "The inquiry at an extension hearing is whether the plaintiff has shown by a preponderance of the evidence that an extension of the order is necessary to protect her from the likelihood of 'abuse' as defined in G. L. c. 209A, § 1." Iamele v. Asselin, 444 Mass. 734, 739 (2005). "Abuse" is defined as, inter alia, "placing another in fear of imminent serious physical harm." G. L. c. 209A, § 1. "When a person seeks to prove abuse by fear of imminent serious physical harm, our cases have required in addition that the fear be reasonable" (quotation and citation omitted). Iamele, supra at 737. "In evaluating whether a plaintiff has met her burden, a judge must consider the totality of the circumstances of the parties' relationship." Id. at 740. A decision to issue or extend a G. L. c. 209A order is reviewed "for an abuse of discretion or other error of law." E.C.O. v. Compton, 464 Mass. 558, 562 (2013). "[A] judge's discretionary decision constitutes an abuse of discretion where [the reviewing court] conclude[s] the judge made a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). "We accord the credibility determinations of the judge who 'heard the testimony of the parties . . . [and] observed their demeanor' . . . the utmost deference." Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 140 n.3 (2006), quoting Pike v. Maguire, 47 Mass. App. Ct. 929, 929 (1999).

 The defendant claims the plaintiff's fear was not objectively reasonable. We disagree. To determine whether the plaintiff's apprehension of anticipated physical force was reasonable, we first "look to the actions and words of the defendant in light of the 

 Page 395 

attendant circumstances." Ginsberg, supra at 143, quoting Commonwealth v. Gordon, 407 Mass. 340, 349 (1990). Importantly, "for the plaintiff's fear of imminent serious physical harm to be reasonable, it is not necessary that there be a history -- or even a specific incident of physical violence." Noelle N. v. Frasier F., 97 Mass. App. Ct. 660, 665 (2020), citing Ginsberg, supra at 145. Rather, as stated above, to evaluate whether the plaintiff met her burden, the judge was required to consider the totality of the circumstances of the parties' relationship. See Iamele, 444 Mass. at 740. "Indeed, in evaluating whether an initial [G. L. c.] 209A order or its extension should issue, the judge must examine the words and conduct in the context of the entire history of the parties' hostile relationship" (quotations and citations omitted). Noelle N., supra.

 In this case, the judge conducted two separate and lengthy evidentiary hearings; at the second hearing, both parties had the benefit of counsel. It is clear that the judge found the plaintiff's testimony at these hearings to be credible. That testimony included a description of what initially was not an atypical relationship, with its starts and stops, that eventually ran its course. However, after the plaintiff made her feelings known, the defendant was unable to accept that she no longer had romantic feelings for him. What was not typical about their relationship was the defendant's obsessive and escalating anger towards the plaintiff. In November 2020, the defendant made an appearance at the plaintiff's home, even though she repeatedly told him not to come. This he documented with a photograph he sent to her, and the entire incident "freaked . . . out" the plaintiff. Then, after the plaintiff told the defendant that she was not romantically interested in him, the defendant inundated her with hundreds of text messages, including the unsolicited photographs of his genitals, hounded her with incessant telephone calls, and attempted to contact her through multiple social media platforms. When the plaintiff enlisted the help of the defendant's family members and friends to "calm" him down, the defendant only became further enraged. Moreover, although the plaintiff testified that the defendant had not been physically violent towards her in the past, [Note 10] he did not understand when she said "no" during "multiple" sexual

 Page 396 

encounters, and on one occasion when he was drunk, he had tried to force the plaintiff to engage in oral sex. In addition, the judge could credit the plaintiff's testimony that when the defendant was under the influence, his behavior became unpredictable, terrifying, and violent. The plaintiff's description of the defendant's escalating anger, raging, and increasing aggressiveness supported the judge's conclusion that "there was an escalating aggressiveness directed at" the plaintiff. See Ginsberg, 67 Mass. App. Ct. at 139, 143 (husband's increasingly out-of-control anger and intimidating behavior resulting in incident of verbal abuse deemed sufficient to justify ex-wife's objectively reasonable fear of imminent serious physical harm). Contributing to the reasonableness of the plaintiff's fear was her testimony that the defendant knew where she lived, that she was a petite woman who lived with just her mother and younger brothers, and that she had no one to protect her, as her father had passed away. 

 The plaintiff's testimony provided an additional circumstance of great import -- that is, the evidence that the defendant threatened to commit suicide and berated the plaintiff for refusing to have a relationship with him. On appeal, the defendant claims that the judge abused his discretion by adding the defendant's threat of self-harm to the calculus of determining whether the plaintiff's fear of physical harm to her was objectively reasonable. We disagree.

 In particular, the judge concluded that the defendant's "threat . . . to commit suicide . . . was an escalating aggressiveness directed at [the plaintiff]." The judge properly concluded that the defendant's suicide threat was a proper factor to consider in determining whether the plaintiff's fear of imminent physical violence was objectively reasonable. See A.S.R. v. A.K.A., 92 Mass. App. Ct. 270, 279 (2017) (in the context of G. L. c. 258E, "a reasonable person would have been warranted in fearing for his physical safety" based on defendant's "hundreds of e-mails," "texts," and "voice messages" threatening to kill herself combined with her unexpected appearances). Indeed, threatening suicide can be a risk factor for future violence in domestic violence cases. [Note 11] Accordingly, the judge's consideration of the defendant's suicide threats 

 Page 397 

was not "a clear error of judgment," and the judge's consideration of those threats did not fall "outside the range of reasonable alternatives." See L.L., 470 Mass. at 185 n.27.

 At bottom, the judge had the benefit of evaluating the plaintiff's credibility through her testimony and demeanor, and he was entitled to credit her testimony concerning her fear. See Pike, 47 Mass. App. Ct. at 929-930. The plaintiff described in detail the defendant's nonstop attempts to contact her, his escalating anger, his terrifying and increasingly aggressive behavior, his tendency towards violence when he was under the influence, and his threats to commit suicide; all of these factors permitted the judge to conclude that the plaintiff's fear of an imminent risk that the defendant would physically harm her was objectively reasonable. Our role as a reviewing court is not to reassess credibility determinations made by the hearing judge, nor is it to decide whether we would have issued the extension of the 209A order in the first instance. See Yahna Y. v. Sylvester S., 97 Mass. App. Ct. 184, 185 (2020) ("We accord the credibility determinations of the judge who 'heard the testimony of the parties . . . [and] observed their demeanor,' . . . the utmost deference" [citations omitted]). Rather, our appellate task is to review the record for errors of law or for an abuse of discretion. See E.C.O., 464 Mass. at 562. Here, there was neither. [Note 12]

 The order dated January 6, 2021, extending the abuse prevention order is affirmed. The order denying the defendant's motion to terminate the abuse prevention order also is affirmed.

 So ordered.

FOOTNOTES
[Note 1] Constance C. did not file a brief and did not argue on appeal. 

[Note 2] The parties' names are pseudonyms. 

[Note 3] To the extent the plaintiff also appeals from the subsequent denial of his motion to terminate the abuse prevention order, he makes no argument specific to that motion, and we deem the issue waived. 

[Note 4] The facts recited herein are derived from the evidentiary hearing on the initial extension hearing, and from the evidentiary hearing on the motion to modify or terminate the abuse prevention order, at which the judge reopened the evidence. 

[Note 5] "FaceTime is a type of 'face-to-face video technology'" (citation omitted). Noelle N. v. Frasier F., 97 Mass. App. Ct. 660, 662 n.3 (2020). 

[Note 6] The plaintiff also noted that because she lived with just her mother and her two younger brothers -- her father had passed away  she had no one to defend her at home. This too made her scared. 

[Note 7] The defendant sent to the plaintiff graphics interchange format (GIF) images of fire and called her a "lowlife." Although the defendant claimed he would not hurt anyone, the plaintiff testified that when the defendant was under the influence of marijuana, he punched two of their friends, leading to his arrest. 

[Note 8] The plaintiff described the defendant's behavior between November 2020 and January 2021, when the abuse prevention order was issued, as "[one hundred] percent escalating." 

[Note 9] To terminate a G. L. c. 209A order, a defendant "must show by clear and convincing evidence that, as a result of a significant change in circumstances, it is no longer equitable for the order to continue because the protected party no longer has a reasonable fear of imminent serious physical harm." MacDonald v. Caruso, 467 Mass. 382, 382-383 (2014). We express no opinion whether a judge may reopen an extension hearing more than two months after extending a G. L. c. 209A order and then terminate the order without finding clear and convincing evidence that the order is no longer equitable. 

[Note 10] The lack of violence during the pendency of the order did not, itself, preclude an extension of the order. See G. L. c. 209A, § 3, as amended by St. 1990, c. 403, § 3, which provides, in pertinent part, that "[t]he fact that abuse has not occurred during the pendency of an order shall not, in itself, constitute sufficient ground for denying or failing to extend the order." 

[Note 11] See Saffren, Professional Responsibility in Civil Domestic Violence Matters, 24 Hastings Women's L.J. 3, 19 (2013) (describing "threats of suicide and self-harm" as red flags of high lethality in domestic violence cases); Goldfarb, Reconceiving Civil Protection Orders for Domestic Violence: Can Law Help End the Abuse Without Ending the Relationship?, 29 Cardozo L. Rev. 1487, 1539-1540 (2008) (explaining researchers have identified "threats of homicide or suicide" as well as "incidents of forced sex" and "level of jealousy" as risk factors for future severe violence between perpetrators and victims of domestic violence); Klein & Orloff, Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law, 21 Hofstra L. Rev. 801, 848 n.236, 863 (1993) (noting "[d]omestic violence consists of a wide range of behaviors, including . . . suicide threats or attempts" as a perpetrator's means to control his victim). 

[Note 12] At the end of the extension hearing, the judge told the parties, "So hopefully there won't be any further problems. It sounds like you both have the potential to have a good future ahead of you. So, you know, just go your separate ways and -- and get on with things without any contact with each other." The defendant claims these remarks demonstrated that the judge lacked certainty that the legal standard had been met. We disagree. The judge recited the proper legal standard at both hearings, and found that it had been met. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.