NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

25-P-524                                          Appeals Court

NAN N.  vs.  REX R.[1]

No. 25-P-524.

Essex.      January 9, 2026. – March 20, 2026.

Present:  Rubin, Grant, & Hodgens, JJ.


Abuse Prevention.  Protective Order.  Electronic Mail.  Witness, Cross-examination.  Words, "Coercive control."


Complaint for protection from abuse filed in the Essex Division of the Probate and Family Court Department on March 26, 2025.

A hearing to extend the abuse prevention order was had before Caryn R. Mitchell-Munevar, J.


Michael Pabian for the defendant.
Robert B. Setterbo, II, for the plaintiff.


GRANT, J.  After an evidentiary hearing at which both parties were represented by counsel, a judge of the Probate and Family Court extended a G. L. c. 209A abuse prevention order

_____

[1] The parties' names are pseudonyms.

(209A order) which had been issued ex parte by a different judge, finding that the order was necessary to protect the plaintiff, Nan N. (wife), from the likelihood of "abuse" as defined in G. L. c. 209A, § 1, both in the form of "coercive control" by the defendant, Rex R. (husband), and because she was in reasonable fear of imminent serious physical harm from the husband. The husband appeals, arguing that the evidence was insufficient; that the judge improperly applied the definition of "coercive control" to the husband's conduct before September 18, 2024, the effective date of the amendment adding coercive control to the statutory definition of abuse, G. L. c. 209A, § 1 (d), St. 2024, c. 118, § 4 (2024 amendment); and that the judge erred by failing in several places to use the word "serious" in her written findings concerning the fear of imminent physical harm faced by the wife. We conclude that the evidence was sufficient to support the judge's finding that the husband committed abuse by placing the wife in reasonable fear of imminent serious physical harm. We therefore do not address the husband's arguments about proof of abuse defined as coercive control.

The husband also argues that, in determining whether the husband abused the wife within the meaning of the statute, the judge improperly considered an e-mail message from the husband's divorce lawyer to the wife's divorce lawyer. Even assuming that

the judge should not have attributed the contents of the e-mail message to the husband, we conclude that the error was not prejudicial. We also reject the husband's argument that, at the evidentiary hearing at which he was represented by counsel and testified, the judge did not sufficiently safeguard his rights to cross-examine the wife and to present evidence.

However, the parties agree -- and we concur -- that the extension of the 209A order for a duration of two years went beyond what was permitted by the statute. On February 25, 2026, we entered an order vacating so much of the 209A order as extended beyond April 2, 2026, and remanded the case to the Probate and Family Court for an extension hearing on or before that date. The 209A order was otherwise affirmed. This decision sets forth our reasoning, including the grounds for our February 25 order.

Background. We summarize the facts found by the judge based on the evidence at the hearing after notice. Because the judge credited the wife's affidavit in its entirety, we include some details from it.

The husband and the wife were married in 1996 and have four children, the youngest of whom are twins who were eighteen years old at the time of the issuance of the 209A order. During the marriage, the wife was "mostly a stay-at-home mom" and the primary parent to their children; she worked "off and on," but

the husband controlled the parties' finances.  In December 2022, due to his work as an attorney, the husband moved from their home in Massachusetts to Florida.  In August 2023, the wife and the twins joined the husband in Florida.

In December 2023, while waiting in line at a store, the wife asked if she could use the husband's cell phone, reaching for it.  The husband smacked the wife's hand, causing her pain and fear, and yelled at her.  On the drive home, the husband berated the wife for having "invaded his personal space."

In their Florida home, the husband routinely followed the wife into the laundry room, the smallest space in the house, and shut the door.  The husband chased the wife there when he was angry.  The wife cried and begged him to leave, but he pushed his body against hers, blocking her exit.  The husband was six feet, one inch tall, and the wife was five feet, three inches tall.  After the wife raised this issue in marriage counseling, the husband's cornering the wife in the laundry room increased in intensity and frequency.

In January 2024, the husband moved out of the Florida home and the parties never lived together again.  On February 20, 2024, the wife informed the husband by text message that she was filing for divorce.  Later that day, the husband burst into the house and cornered the wife in the kitchen, using his body to pin her against the lit stove.  Yelling in her face, the husband

said, "[she] could have a divorce, but [she] couldn't have [her] own lawyer, [they] would use one lawyer." The wife could feel the heat of the stove flames just inches from her back and was afraid that the husband would force her into the flames or that her clothing would catch fire. After the wife inched sideways away from the stove, the husband pinned her against the counter. Crying, the wife begged the husband to leave, but he refused and kept pushing her and screaming. When the husband learned that their child was home, he backed off and the wife went outdoors and telephoned her lawyer. The husband followed her and demanded to speak to the lawyer, and the wife put the call on speakerphone. The lawyer managed to placate the husband, who agreed to leave, but as soon as the husband ended the call, he told the wife that "he wasn't going anywhere," and "he could come in and get [her] day or night because it's his house." The husband screamed at the wife outdoors until she dialed 911, when he left. That night, the wife had the locks changed. The wife later learned that the husband was watching her on the home's security camera.

The day after the husband learned that the wife was filing for divorce, he removed over $100,000 from the parties' joint checking account and canceled her as an account holder from several of their joint credit cards.

On multiple occasions, the husband verbally abused the wife, calling her names including "psycho bitch." The husband said that because he was a lawyer he understood how the court system works, and the wife did not because she was "so stupid." The husband repeatedly demanded that the wife fire her divorce lawyer, and said that if she did not, he would "destroy" her. He said if she did not agree to engage in a collaborative divorce process, he would have her "put in jail for changing the locks" and "take the kids from [her]." The husband said that the only way that she and the twins could leave Florida was if she agreed to that process.

The parties engaged in the collaborative divorce process in Florida. During the process, both the wife's lawyer and the mental health neutral expressed concern for the wife's safety and arranged that one of them would escort her from and to her car. On one occasion, the husband pushed past the wife's lawyer and followed the wife to her car, yelling that she needed to talk to him without lawyers. The wife managed to reach her car and drive away.

On March 18, 2024, the husband came to the Florida house, begging to talk to the wife and sobbing. He sat at the kitchen table and expressed thoughts of killing himself. The next day, the wife contacted him saying she was concerned about him, but he denied the conversation had happened. The wife feared for

her safety because the husband "refuse[d] to acknowledge reality, and if he is capable of killing himself then [she was] afraid he is capable of killing [her]."

In April 2024, at their children's athletic event, the husband followed the wife around, demanding that she fire her divorce lawyer.  The husband followed the wife to her car, backed her up against the car door, and screamed in her face that she would "never see a fucking penny of his money," he would "bankrupt" her, and he would show everyone how "fucking stupid" she was.  The husband was bent over the wife and was so close that his spit was flying onto her face.

The husband sent the wife an e-mail message stating that he was going to sell the Massachusetts home.  In the collaborative divorce process, the husband agreed that the wife and the twins could live in that home, but when the wife began arranging the move the husband said that if she left Florida with the twins, he would have her arrested.  In May 2024, the husband signed a parenting plan agreeing that he would not enter the Massachusetts home unless invited.

On June 1, 2024, the wife and the twins moved back into the Massachusetts home.  The wife noticed that whenever she or one of the children arrived home, soon afterwards the husband would contact them by text message.  Realizing that the husband was watching them by means of the doorbell camera, the wife put duct

tape over its lens, but the husband's monitoring continued, and she realized he was still alerted to their movements by notifications from the camera.

In January 2025, the husband sent frequent text messages to the wife that they could resolve their differences without lawyers. During a January 6 telephone call, the wife told the husband that she needed to feel safe in the Massachusetts home and she did not want him to come there unless previously agreed to and scheduled. The husband replied that he could enter that home "at any time, day or night," and that he was letting the wife and children stay there "as a courtesy." The husband told the wife "that he will come into the home if he wants to and [she] cannot stop him."

In early March 2025, the husband sent text messages to the wife nearly every day, sometimes multiple times a day, demanding to speak with her. He told her he was coming to Massachusetts on March 27 and would stay in the Massachusetts home. The wife was afraid for her safety from his threats to stay in the Massachusetts home and believed that he made them to instill fear in her. The husband had a Massachusetts firearms license and access to firearms.

On March 26, 2025, the day before the husband was due to arrive, the wife filed the complaint for protection from abuse, alleging that the husband had caused her physical harm,

attempted to cause her physical harm, placed her in fear of imminent serious physical harm, and engaged in coercive control by a pattern of behavior as described in G. L. c. 209A, § 1 (d) (a).[2] The ex parte 209A order issued, commanding the husband, among other things, to stay away from the Massachusetts home; not contact the wife; and not abuse the wife, including by coercively controlling her as defined in G. L. c. 209A, § 1 (d).[3] A hearing after notice, G. L. c. 209A, § 3, was scheduled for April 2. On March 31, the husband's divorce lawyer sent the wife's divorce lawyer an e-mail message, discussed below.

At the hearing after notice, the only definition of abuse argued by the wife's counsel was that she was in fear of imminent serious physical harm. The judge considered the wife's affidavit, the husband's testimony, the March 31 e-mail message, and arguments of both counsel. The judge extended the order for two years. The next day, the husband filed a notice of appeal.

---

[2] The husband did not include the complaint in the record appendix, although he relies on it in his brief, including by arguing that the wife's affidavit did not prove her allegations of abuse. As appellant, the husband had the burden to provide us with a complete record. See Mass. R. A. P. 18 (a) (1) (A) (v) (a), as appearing in 481 Mass. 1637 (2019). See also G.B. v. C.A., 94 Mass. App. Ct. 389, 397 n.13 (2018).

[3] The 209A order also required the husband to surrender to the local police department all guns and ammunition, and suspended any license to carry and firearms identification card.

About three weeks later, the judge issued written findings of fact.[4]

Discussion. 1. Extension of 209A order. a. Standard of review. We review the extension of a 209A order "for an abuse of discretion or other error of law" (citation omitted). Vanna V. v. Tanner T., 102 Mass. App. Ct. 549, 552 (2023). "[A] judge's discretionary decision constitutes an abuse of discretion where [the reviewing court] conclude[s] the judge made a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives." Constance C. v. Raymond R., 101 Mass. App. Ct. 390, 394 (2022), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). We accord the "utmost deference" to the credibility determinations made by the judge who "heard the testimony of the parties . . . [and] observed their demeanor" (citation omitted). Noelle N. v. Frasier F., 97 Mass. App. Ct. 660, 664 (2020).

---

[4] The husband argues that we should decline to consider the judge's findings of fact, issued after the husband filed his notice of appeal but before the Probate Court record was assembled for appeal, because they were not authorized by Mass. R. Dom. Rel. P. 52 (a), which allows parties to request additional findings after trial. He cites nothing that prohibits the judge from issuing such findings or an appellate court from considering them.

At the hearing after notice, the wife bore the burden to prove by a preponderance of the evidence that she was suffering from abuse as defined in G. L. c. 209A, § 1, and that "an extension of the order [was] necessary to protect her from the likelihood of 'abuse.'"  Vera V. v. Seymour S., 98 Mass. App. Ct. 315, 317 (2020), quoting Iamele v. Asselin, 444 Mass. 734, 739 (2005).  See Guidelines for Judicial Practice:  Abuse Prevention Proceedings § 5:04 (Oct. 2025) (Judicial Guidelines).

b.  Definitions of abuse.  As relevant to our analysis in this case, the statute defines abuse to include "attempting to cause or causing physical harm," "placing another in fear of imminent serious physical harm," and "coercive control."[5]  G. L. c. 209A, § 1.[6]  The 2024 amendment added "coercive control" to the definition of abuse, and defines coercive control to include:

---

[5] The definition also includes "causing another to engage involuntarily in sexual relations by force, threat or duress," G. L. c. 209A, § 1 (c), and a plaintiff may seek protection from past physical abuse under § 1.

[6] Until the 2024 amendment, the definition of abuse in G. L. c. 209A, § 1, required proof of "the occurrence of one or more of the following acts between family or household members" (emphasis added).  G. L. c. 209A, § 1, as amended by St. 1996, c. 450, § 232.  The 2024 amendment changed that language to "the occurrence of any of the following acts between family or household members" (emphasis added).  G. L. c. 209A, § 1, as amended by St. 2024, c. 118, § 4.  The husband does not argue that the change from "one or more" to "any" made a difference here.

"(a) a pattern of behavior intended to threaten, intimidate, harass, isolate, control, coerce or compel compliance of a family or household member that causes that family or household member to reasonably fear physical harm or have a reduced sense of physical safety or autonomy, including, but not limited to:

". . .

"(ii) depriving the family or household member of basic needs;

"(iii) controlling, regulating or monitoring the family or household member's activities, communications, movements, finances, economic resources or access to services, including through technological means; . . . ."

G. L. c. 209A, § 1 (d).

Often the theory of abuse that a judge considers in deciding whether to issue a 209A order is whether the defendant placed the plaintiff in reasonable fear of imminent serious physical harm. See Iamele, 444 Mass. at 739-740. In evaluating whether a plaintiff met the burden of proving a reasonable fear of imminent serious physical harm, a judge is required to "consider the totality of the circumstances of the parties' relationship." Id. at 740. Indeed, we have referred to the totality of the circumstances of the parties' relationship as "[t]he touchstone of an analysis as to whether a plaintiff has met her burden in a 209A proceeding." G.B. v. C.A., 94 Mass. App. Ct. 389, 394 (2018). The totality of the circumstances is not limited to a defendant's conduct that constitutes physical abuse. Conduct that constitutes verbal, emotional, or economic

abuse may exacerbate a plaintiff's fear of imminent serious physical harm. See C.R.S. v. J.M.S., 92 Mass. App. Ct. 561, 563 (2017) (plaintiff met burden with evidence of "at least two separate incidents of physical assault . . . in the course of a deteriorating and stressful relationship . . . characterized by the defendant's controlling behavior as well as verbal and emotional abuse"); Schechter v. Schechter, 88 Mass. App. Ct. 239, 241-242 & n.5 (2015) (discussing "numerous instances of emotional and economic abuse").

c. Application to this case. At the hearing, before discussing coercive control, the judge said, "[H]is behavior towards her is abusive." In her written findings, the judge found that the wife proved that the husband's conduct met three of the statutory definitions of abuse: attempting to cause the wife physical harm, placing her in fear of imminent serious physical harm, and coercive control. In her written findings, the judge also found that the wife needed protection from both coercive control and fear of imminent physical harm.

i. Coercive control. The husband's arguments revolve primarily around the judge's conclusion that the wife was subject to the husband's coercive control and needed protection from it. In particular, the husband contends that the evidence at the hearing after notice was insufficient to prove abuse, because the judge improperly applied the definition of abuse

that included coercive control to his conduct before the effective date of the 2024 amendment, i.e., September 18, 2024. The husband also argues that in determining whether he engaged in coercive control, the judge wrongly attributed to him what the judge determined were threats contained in the e-mail message from the husband's Florida divorce lawyer to the wife's Florida divorce lawyer, despite the absence of any evidence that the husband read it or authorized its transmission in advance.[7]

We need not and do not decide whether the judge could apply retroactively the coercive control provision of the 2024 amendment or consider the e-mail message. Even assuming the husband is correct, and that the findings of abuse by coercive control and risk of coercive control cannot stand, the extension order is independently supported on the ground that the wife suffered abuse through reasonable fear of imminent serious physical harm and required protection because of such abuse.

ii. _Fear of imminent serious physical harm_. Contrary to the husband's argument, there is adequate support for the judge's finding of reasonable fear of imminent serious physical

_____

[7] The judge found that the e-mail message was "threatening the [wife]'s financial security, an attempt at intimidating a witness and an attempt to negotiate her safety." Then, in her written findings, based on the husband's testimony, the judge concluded that the husband "was more concerned about his reputation and how he would be affected by the [209A] order as opposed to his threatening abusive behavior towards the [wife]."

harm.  Although, as the judge correctly stated in her written order, "[t]he [wife] did not need to offer evidence of physical violence or overt threats to prove that her fear was reasonable," the judge found that the wife credibly described "specific incidences of physical abuse" and "physical violence" perpetrated by the husband.  The husband chased the wife into the laundry room, pushed his body against hers, and blocked her from leaving.  Just after learning that the wife had filed for divorce, the husband "assaulted the [wife] by pushing her against a lit stove."  After their children's sports event, the husband backed the wife up against her car, screaming and projecting spit onto her face.  See Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 141-142 (2006) (defendant followed plaintiff and screamed in her face so closely she could feel his spit on her face).  Passing over whether that evidence proved the husband committed abuse defined as "attempting to cause or causing physical harm," we conclude that it proved that the husband abused the wife by "placing [her] in fear of imminent serious physical harm."  G. L. c. 209A, § 1 (b).

The judge properly considered the husband's psychological and verbal abuse of the wife.  See C.R.S., 92 Mass. App. Ct. at 563.  The day after the wife filed for divorce, the husband cut off her access to funds.  The husband repeatedly demanded that the wife fire her divorce lawyer and threatened to have her

evicted from the Florida home and arrested for changing its locks. The husband sent the wife text messages "almost every day, sometimes multiple times a day demanding that she speak with him." He tracked her movements with the security camera in the Florida home and the doorbell camera in the Massachusetts home. See Constance C., 101 Mass. App. Ct. at 397 (evidence of abuse included "defendant's nonstop attempts to contact [the plaintiff], his escalating anger, his terrifying and increasingly aggressive behavior"). Here, the husband told the wife "that he felt like killing himself and later denied that the conversation ever took place." See id. at 396 & n.11 (defendant's suicide threat relevant to reasonableness of plaintiff's fear of physical harm).

In determining the reasonableness of the wife's fear, the judge also considered her demeanor in the court room, finding that "[t]he [wife] was visibly shaking throughout the proceeding, she had her arms folded curling into herself, [she] avoided eye contact with the [husband] and was tearing [up]." See Iamele, 444 Mass. at 740 (judge should consider "parties' demeanor in court").

The judge concluded that the 209A order was necessary to protect the wife from the likelihood of future abuse. After having signed a parenting plan agreeing that he would not come to the Massachusetts home without permission, the husband

announced that he was coming to stay there beginning March 27, 2025.  The husband said that the wife could not stop him and he could enter that home "at any time, day or night."  See Vanna V., 102 Mass. App. Ct. at 553-554 (2023) (in context of long history of abuse during nearly thirty-five year marriage, targeted vandalism of ex-wife's car supported reasonable fear of imminent serious physical harm).

The husband contends that the judge did not apply the correct definition of abuse as "fear of imminent serious physical harm," G. L. c. 209A, § 1 (b), because a few times in the "Rational[e]" section of her findings of fact, the judge misquoted the standard as "fear of imminent physical harm," omitting the word "serious."  At another point in her findings, the judge did include the word "serious" when she described the standard as "imminent fear of serious bodily harm."[8]  The judge had before her the complaint, which she referred to in her findings, and it correctly recited the standard as "fear of imminent serious physical harm."  The judge also found that the

---

[8] We note that the judge used the word "bodily" instead of "physical," and placed the adjective "imminent" so that it modified "fear" instead of "harm."  Cf. Commonwealth v. Gupta, 84 Mass. App. Ct. 682, 685-686 (2014) (judge misquoted stalking statute, G. L. c. 265, § 43 [a], as requiring intent to cause "imminent fear of death or bodily injury," but "imminence properly refers not to fear but rather to physical harm").  We remind judges when drafting findings to quote the legal standard directly from the applicable statute.

husband abused the wife by attempting to cause her physical harm.  In that context, the judge's findings leave no doubt that she credited the evidence that what the wife feared was physical harm that was serious and imminent.  Contrast G.B., 94 Mass. App. Ct. at 396 (although judge did not make findings of fact, appellate court could discern reasonable basis for 209A order from judge's ruling extending it), with Iamele, 444 Mass. at 741 (remanding for further hearing where judge found that plaintiff was "genuinely frightened," but did not state whether he credited her testimony "relating to the reasonableness or imminence of her fear").

We discern no abuse of discretion in the judge's extension of the 209A order based on the plaintiff's reasonable fear of imminent serious physical harm.  In those circumstances, we do not reach the question whether proof of abuse would have been sufficient solely on the theory of coercive control.  See Judicial Guidelines § 1.00A commentary (noting that "reasonable fear of physical harm or reduced sense of physical safety" required for coercive control provides lower threshold than fear of imminent serious physical harm).

2. Opportunity to cross-examine wife.  The husband argues that his due process rights were violated at the hearing after notice because the judge deprived him of the opportunity to

cross-examine the wife and did not give him a sufficient opportunity to present his case. We disagree.

At the hearing after notice, the wife's counsel presented her affidavit and told the judge, "obviously my client would reassert and reaffirm her statements in the affidavit today." Neither the husband nor his counsel ever sought to cross-examine the wife.

Instead, when the judge questioned the husband's counsel about the factual allegations in the wife's affidavit, the husband interrupted and answered the judge. The transcript of the hearing spanned just over twenty-three pages, of which the husband testified in narrative form for six pages without interruption. The judge did not curtail the husband or his counsel from presenting the case as they saw fit, as occurred in Idris I. v. Hazel H., 100 Mass. App. Ct. 784, 790 (2022). See Judicial Guidelines § 5:01.

3. Extension for two years. Finally, both parties assert that the judge erred by extending the 209A order for a period of two years. We agree.

At the initial hearing after notice, "[a]ny relief granted by the court shall be for a fixed period of time not to exceed one year." G. L. c. 209A, § 3. See MacDonald v. Caruso, 467 Mass. 382, 386 (2014). It is only at a subsequent hearing that the judge may decide "to extend the order for any additional

time reasonably necessary to protect the plaintiff or to enter a permanent order." G. L. c. 209A, § 3. See Crenshaw v. Macklin, 430 Mass. 633, 636 (2000); Vittone v. Clairmont, 64 Mass. App. Ct. 479, 486 (2005). See also Judicial Guidelines § 6:02 & commentary. At the hearing after notice, it was premature for the judge to extend the order beyond one year, and thus we are constrained to remand the case to the Probate and Family Court.

Conclusion. For the reasons set forth in this opinion, on February 25, 2026, we entered an order vacating so much of the April 2, 2025 209A order as extended beyond April 2, 2026, and remanded the case to the Probate and Family Court for an extension hearing on or before April 2, 2026. The 209A order was otherwise affirmed.